# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SAHMANTHA S. CANNON,

       Plaintiff,

vs.                                    No.  05cv1028 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Cannon's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 10]**, filed January 6, 2006, and fully briefed on April 27, 2006.  On November 19, 2004, the Commissioner of Social Security issued a final decision denying Cannon's claim for disability insurance benefits.  Cannon seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

Cannon, now forty-three years old (D.O.B. 06/10/63), filed her application for disability insurance benefits on August 1, 2002 (Tr. 67), alleging disability since February 15, 2002 (Tr. 106), due to degenerative joint disease, fibromyalgia, lupus, migraines, depression, anxiety, and chronic pain (Tr. 68).  Cannon has a two-year college degree in nursing and past relevant work as a registered nurse.  Tr. 15.  On November 19, 2004, the Administrative Law Judge (ALJ) denied benefits, finding Cannon's degenerative joint disease of both knees was a severe impairment but

"not severe enough to meet or medically equal one of the impairments listed in Appendix 1,

Subpart P, Regulations No. 4." Tr. 69. The ALJ further found Cannon retained the residual

functional capacity (RFC) "to lift and carry fifteen pounds, sit for one hour at a time, and stand

and/or walk for ten to fifteen minutes at a time." Tr. 71. As to her credibility, the ALJ found her

"subjective allegations [were] wholly out of proportion to the objective evidence of record, and

her own actions [were] inconsistent with her allegations of extreme pain." *Id.* Cannon filed a

Request for Review of the decision by the Appeals Council. On January 23, 2005, the Appeals

Council denied Cannon's request for review of the ALJ's decision. Hence, the decision of the

ALJ became the final decision of the Commissioner for judicial review purposes. Cannon seeks

judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience.  *Id.*

In support of her motion to reverse, Cannon makes the following arguments: (1) the ALJ failed to consider all her severe impairments at step two of the sequential evaluation process; (2) the ALJ erred in his analysis under the listing of impairments; (3) the ALJ erred in his credibility assessment; (4) the ALJ erred in finding that she had the RFC for light work; (5) the ALJ erred in finding that she had the RFC for performance of jobs that exist in substantial numbers; and (6) the ALJ erred in finding she was not disabled under the grid regulations.

Because the ALJ's primary reason for rejecting claimant's complaints of disabling pain was that she was not wholly credible, the Court will address this issue first.

## A.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the

frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, and the consistency or compatibility of nonmedical testimony with objective medical evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)(quotation omitted).

The inability to work pain-free is not sufficient reason to find a claimant disabled. *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988). "'To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment.'" *Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir. 1986)(quoting *Dumas v. Schweker,* 712 F.2d 1545, 1552 (2d Cir. 1983)). Moreover, "a claimant's subjective complaint of pain is by itself insufficient to establish disability." *See Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990).

Cannon claims the ALJ erred in his credibility determination because he "picked and choose (sic) isolated pieces of evidence in a voluminous file to find [her] to be not credible." Pl.'s Mem. in Supp. of Mot. to Remand at 11. The Court disagrees. In determining whether Cannon's pain was disabling, the ALJ properly examined the medical record and evaluated her credibility.

In his decision, the ALJ found:

> Statements made by the claimant, at the hearing and in the written record, reveal that she alleges extreme, **debilitating pain as a result of multiple conditions including arthritis, lupus, fibromyalgia, a bad back and migraines**. **She also alleges depression**. While the objective evidence does support a finding that the claimant is limited to a restricted range of light work activity as a result of her multiple knee surgeries, **her allegations of debilitating pain are not supported**. The medical evidence reflects that, following her last surgery, by June 12, 2002, the claimant had full range of motion in both knees, no swelling, and good patellar mobility. Her treating orthopaedic surgeon, Brant Baird (sic), M.D., indicated that she was capable of returning to full-time sedentary employment provided that she not stand for more than fifteen minutes at one time (Exhibit 4F). In a report dated September 16, 2002, board certified rehabilitation specialist Theresa Genovese-Elliott, M.D., also indicated that the claimant was capable of performing light work activity, including lifting up to twenty pounds, but was restricted to standing and walking for only fifteen to thirty minutes at one time. Dr. Genovese-Elliott also indicated that the claimant was capable of working a full eight-hour day (Exhibit 7F). Further, an MRI of the thoracic spine performed in January

2003 showed only minimal annular bulging at T6-T7 with no evidence of spinal stenosis or foraminal narrowing (Exhibit 21F, Page 145).  Also, although the claimant complains of both lupus and fibromyalgia, her lab work has consistently been normal, including ANA, rheumatoid factor, and C-reactive protein, showing no evidence of a rheumatoid or systemic process (Exhibit 3F, Page 2; Exhibit 21F, Pages 112-116).

The record also indicates the claimant was, in fact, working as recently as August 2004 (Exhibit 21F, Page 20).  **Although the claimant complained of extreme back pain and fibromyalgia, she reported to Dr. Abel in July 2002 that she had sprained her ankle while hiking and camping, and she also told Dr. Abel that she had lifted her 70-pound dogs into the car (Exhibit 8F, Page 29)**.  Although Dr. Abel recommended that the claimant see a rheumatologist, she repeatedly refused (Exhibit 8F, Page 65).   She was also given authorization for a home exercise machine in April 2003 to help strengthen her joints and reduce pain; however, by September 2003, she still had not assembled the machine for use (Exhibit 21 F, Pages 45 and 68).  **These behaviors are clearly inconsistent with her constant allegations of extreme pain**.

**Further eroding the claimant's already suspect credibility is a functional capacity evaluation dated September 10, 2002.**  The evaluator determined that the claimant's range of motion, lifting, carrying, and pushing tests were all invalid due to poor effort.  The claimant scored 100% positive for inappropriate illness behavior, and the evaluator stated that the claimant appeared to be pain focused and self-limited.  **The evaluator further indicated that the claimant was capable of working at the light exertional level (Exhibit 6F)**.

**With respect to her allegations of depression and anxiety, although the claimant has been treated pharmacologically for psychological symptoms, there is nothing in the record to indicate that she has ever been treated by a psychologist or psychiatrist, nor is there any evidence that she received psychotherapy or counseling of any kind.  There are no records of any acute psychological episodes, nor is there any evidence of significant limitations due to psychological symptoms. This is inconsistent with the presence of a severe mental impairment.**

**In addition, while she alleges extreme pain due to fibromyalgia, migraines, and a back impairment, the record contains multiple instances of drug seeking behavior on the part of the claimant.**  As early as April 2001, the record indicates the claimant was using an excessive amount of narcotic pain medication, as she had used 180 Lortab pills in three weeks, approximately nine per day (Exhibit 8F, Page 91). In June 2001, she requested IV narcotics at the emergency room after her physician refused to give her the same IV pain medication. At that time, the claimant's PCP, Dr. Abel, noted that she was very concerned about narcotic abuse and addiction in the claimant (Exhibit 8F, Page 82).  In August 2001, Dr. Abel noted that an anonymous caller stated that the claimant was a substance abuser; that she had sold some of the narcotics prescribed to her (Exhibit 8F, Page 73).  In September 2001, the claimant stated that the pharmacy had lost her prescription for morphine and requested a second prescription (Exhibit 8F, Page 61).  Later that same month, she called Dr. Abel and stated that her ex-boyfriend broke into her house and stole her prescription.  She then asked for another prescription for morphine (Exhibit 8F, Page 60).  In October 2001, the claimant attempted to secure narcotic pain medication from another physician despite being warned by

6

one physician that he would not prescribe additional pain medication without authorization from the primary care physician (Exhibit 2F, Pages 28 and 36).  In June 2002, the claimant had used her month's supply of morphine in three weeks and demanded another refill, which Dr. Abel denied (Exhibit 8F, Page 31).  In September 2002, Dr. Genovese-Elliott noted that the claimant had once again attempted to obtain narcotic pain medication despite having been told that only her primary care physician would be prescribing such drugs.  At that point, the claimant indicated that she had "fired" her PCP and now needed a new narcotic prescription (Exhibit 7F).  In November 2002, Dr. Abel indicated that she felt the claimant was using too much Ativan and voiced concern that the claimant was becoming addicted (Exhibit 21F, Page 82).  In December 2002, the claimant requested a refill of Percocet after using 60 pills in only 12 days (Exhibit 21F, Page 78).  In February 2004, the claimant stated she lost her prescription for Percocet and requested another which was refused by Dr. Abel (Exhibit 21 F, Page 35).  In March 2004, the claimant requested a refill of her Percocet after only three weeks.  This request was again refused by Dr. Abel, who stated that it was too soon for a refill (Exhibit 21 F, Page 24).  **Clearly, this claimant has a long history of attempting to obtain narcotic pain medications beyond the level prescribed by her physicians**.

** ** ** ** ** ** **

In short, the **claimant's subjective allegations are wholly out of proportion to the objective evidence of record, and her own actions are inconsistent with her allegations of extreme pain**.  There is ample evidence of narcotic-seeking behavior on the part of the claimant, and virtually nothing that would support her allegations of disabling pain.

Tr. 69-71 (emphasis added).

As a preliminary matter, the Court notes that Cannon had been employed as a registered nurse starting in March 1988 (Tr. 114) through February 15, 2002, the date last worked at Casa Real (Tr. 137).  Additionally, on **October 21, 2001**, Cannon sustained an injury to her knees while at work at Casa Real. [1]

After examining the record as a whole, the Court is persuaded that the ALJ's credibility findings are closely and affirmatively linked to substantial evidence.  Cannon's argument to the contrary constitutes an invitation to this Court to engage in an impermissible reweighing of the evidence and to substitute its judgment for that of the Commissioner, an invitation the Court must decline.  *See Qualls*, 206 F.3d at 1371.  As the medical records indicate, as early as March

---

[1] The complete medical record is found at Appendix A.

7

27, 2001, Dr. Abel expressed concern at the amount of narcotics Cannon was taking for her pain. Tr. 384-385.  On April 30, 2001, Dr. Atterbury also questioned narcotic abuse and reported to Dr. Abel that Cannon had also received Lortab from her dentist.  Tr.  378.  There is no evidence in the record that Cannon ever advised Dr. Abel that she also was receiving narcotics from her dentist.  In fact, the evidence shows several occasions when Cannon sought narcotics from other physicians, even from physician that had directed her not to request narcotic analgesics from them.  Cannon also failed to inform physicians at the emergency room on all her visits but one that she was taking narcotic analgesics on a regular basis.  Moreover, Dr. Atterbury (Tr. 380), Dr. Guggenheim (Tr. 374) , Dr. Frank (Tr. 373), Dr. Bair (Tr. 224, 237, 242),  Dr. Elliott (Tr. 276-277, 316), Dr. Abel (Tr. 316, 322, 349, 356, 375-377, 382, 683), and Dr. Thompson (Tr. 356) also questioned Cannon's credibility regarding her allegations of  "severe pain."

The Court also notes, as did the ALJ, that Dr. Abel received a call from an individual depicting Cannon as a substance abuser.  The individual claimed Cannon was selling the narcotics prescribed by her physicians and also giving them to her boyfriend.  Tr. 364.  Although Cannon denied this allegation, she later attempted to get more narcotics from Dr. Abel, claiming her boyfriend had stolen her prescription.  Tr. 351.  On this occasion, Dr. Abel denied Cannon's request for a new prescription because her refills were exhausted.  *Id.*  There were also many instances where Cannon requested refills of her narcotics and Dr. Abel refused her request because it was too early to grant another refill.  *See, e.g.,* Tr. 40-41, 315, 332,  334, 356, 372, 377-378, 625, 626, 682-683.  On one of this occasions, Cannon claimed that the pharmacy had "shorted" her pills.  Tr. 372. Cannon also claimed she had lost her prescription.  Tr. 636. Although a "plaintiff's history of drug seeking behavior does not render [the patient's] pain

8

complaints incredible," *see Bakalarski v. Apfel*, No. 97-1107, 1997 WL 748653 (10th Cir. Dec. 3, 1997)(unpublished opinion), in this case there is overwhelming evidence supporting the ALJ's determination that Cannon's complaints of "debilitating" pain were not credible.

Additionally, although several rheumatologists (Dr. Dean, Dr. Sokoloff, Dr. Hasserner) evaluated Cannon for lupus and opined that Cannon did not have it, nonetheless, she repeatedly claimed she "possibly had lupus."   On June 22, 2005, Cannon informed Dr. Schwartz that she had been diagnosed with lupus but did not know her titer level.  Tr. 751.  However, there is no evidence in the record that Cannon was ever diagnosed with lupus.  And, the picture Cannon presented to Dr. Schwartz is quite different from Dr. Abel's medical notes regarding Cannon's general appearance.  Notably, on December 12, 2003, Cannon informed her counselor at New Mexico Division of Vocational Rehabilitation that **she had been taking care of her elderly father** (79 years old) following his surgery and could not meet with her until January.  Tr. 154.  Yet, less than a month before this visit, Cannon informed Dr. Schwartz that she was "housebound" due to pain in her back, neck, and knees and severe migraine headaches" and "had been unable to clean her house for many months."   Tr. 565-566; *see also* Tr. 662 ("Planning some fun events next week".).

Finally, the ALJ's finding that "[Cannon's] subjective allegations [were] wholly out of proportion to the objective evidence of record" is supported by the record.  The record indicates that Dr. Bair and Dr. Elliott found Cannon's subjective complaints were wholly out of proportion to the objective evidence when they evaluated her knees.  Dr. Elliot opined "that the amount of pain [Cannon] has does not correlate with her x-ray or arthroscopic findings to date."   Tr. 315. Dr. Frank also questioned Cannon's subjective complaints of "sudden acute headache pain" when

9

he treated her at the Pain Clinic.  Tr. 373.  When Cannon requested injectable Demerol for severe jaw pain because she had been treated with Demerol over the weekend for the same problem, Dr. Abel noted that she had seen Cannon at the nursing home on Thursday and was "participating in the wheel chair racing and seemed fine."  Tr. 376.  Dr. Abel made similar observations when Cannon complained of "severe pain in her kidneys."  Tr. 356.  Dr. Abel noted she had seen her at the nursing home and Cannon had reported that she was much better.  When Dr. Abel attempted to return Cannon's calls there was no answer at work or at home.  Dr. Abel's staff reported seeing Cannon shopping at Albertson's and looking fine.  *See, also*, Tr. 387-388 (all her laboratory work was normal); Tr. 438 (HIDA scan negative, ultrasound normal, UGI series negative, surgical consultation negative); Tr. 307-308 (x-rays and laboratory work normal); Tr. 635 (ultrasound negative again); Tr. 451 ( MRI of thoracic spine- "a very small annular bulge at the T6-7 level without evidence of significant spinal stenosis or neural foraminal narrowing); Tr. 214-215 (Dr. Hasserner found all lab work essentially normal, including a negative ANA screen).

       "Because '[e]xaggerating symptoms or falsifying information for purposes of obtaining government benefits is not a matter taken lightly by this Court,' [the Court] generally treat[s] credibility determinations made by an ALJ as binding upon review."  *Talley v. Sullivan*, 908 F.2d at 587.  Accordingly, based on the record as a whole the Court finds the ALJ's credibility determination is supported by substantial evidence and will not be disturbed.

**B.  Step Two of the Sequential Evaluation Process**

At step two of the sequential evaluation process, the claimant bears the burden to demonstrate that she has a medically severe impairment or combination of impairments that significantly limits her ability to do basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c)*; see also, Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Eden v. Barnhart*, No. 04-7019, 2004 WL 2051382 (10th Cir. Sept. 15, 2004).  Basic work activities are "abilities and aptitudes necessary to do most jobs," and include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting."  *Id.*

The step two severity determination "is based on medical factors alone, and . . . does not include consideration of such vocational factors as age, education, and work experience." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cr. 1988); 20 C.F.R. §§ 404.1520(c), 416.920(c). Although step two requires only a "de minimis" showing, the mere presence of a condition or ailment documented in the record is not sufficient to prove that the plaintiff is significantly limited in the ability to do basic work activities, *see Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997).   To meet her burden, Cannon must furnish medical and other evidence to support her claim.  *Bowen v. Yuckert*, 482 U.S. at 146 & n.5.

In his decision, the ALJ found "the medical evidence indicates that the claimant has degenerative joint disease of both knees, an impairment that is 'severe' within the meaning of the Regulations, but not 'severe' enough to meet or medically equal one of the impairments listed in

11

Appendix 1, Subpart P, Regulations No. 4." Tr. 69. Cannon contends the ALJ failed to consider

all of her severe impairments at step two of the sequential evaluation process, specifically,

fibromyalgia, migraine headaches, fatigue and depression. *See* Pl.'s Mem. in Supp. of Mot. to

Remand at 9-10.

The Court has carefully reviewed the record and finds that substantial evidence supports

the ALJ's finding that Cannon's depression and fatigue did not have a significant effect on her

ability to work. A review of the record shows that Cannon complained of fatigue on May 8, 2002

(Tr. 326-327) and March 18, 2004 (Tr. 627-628). In terms of her depression, Cannon reported

that "her depression would not keep her from working." *See* Tr. 463 (depression nonsevere), Tr.

476 (Cannon reported her depression would not keep her from working). The record also

indicates that Cannon's depression was under control. On January 16, 2001, her first visit to Dr.

Abel, Cannon reported she was doing well on Paxil. Tr. 390 ("seems ok on Paxil"). Cannon did

not report a problem regarding depression until almost a year later, on December 27, 2001. Tr.

343. At that time, Cannon opined that the Paxil was not working, therefore Dr. Abel switched

her to Zoloft. Tr. 344. By January 16, 2002, Dr. Abel noted that Cannon's depression was

"better on inc[reased] Zoloft dose." Tr. 341. On September 18, 2002, Cannon returned to see

Dr. Abel to "review weight gain, review depression." Tr. 313. Cannon reported her insurance

was recently "cut off," was very stressed, had a functional capacity exam which qualified her for

light duty, and her grandfather was dying of old age." Tr. 314. Dr. Abel noted she would

continue Cannon on Prozac "at current dose" because Cannon did not want to change it and

"hopefully current stressors will lessen." *Id.* On October 9, 2002, Cannon returned to see Dr.

Abel. Tr. 311. On that day, Dr. Abel noted, "no new symptoms of depression or anxiety" and

"continue Prozac which she feels is best for her." Tr. 312, 313. On October 16, 2002, Dr. Abel noted "on antidepressants with fair response." Tr. 310. Based on the record as a whole, the Court finds that substantial evidence supports the ALJ's finding that Cannon's fatigue and depression were not severe at step two of the sequential evaluation process.

However, the ALJ erred in finding at step two that Cannon's fibromyalgia and migraine headaches were not severe impairments. As to the fibromyalgia, the ALJ found that, "although the claimant complains of both lupus and fibromyalgia, her lab work has consistently been normal, including ANA, rheumatoid factor, and C-reactive protein, showing no evidence of a rheumatoid or systemic process." Tr. 70.

In *Brown v. Barnhart,* No. 05-5143, 2006 WL 1431446, at *2 (10th Cir. May 25, 2006), the Tenth Circuit addressed a similar issue regarding fibromyalgia and found the ALJ erred at step two of the sequential evaluation process in finding that the claimant's fibromyalgia was not a severe medical impairment. The Tenth Circuit made clear that "a lack of results from objective laboratory tests for the presence or severity of fibromyalgia do not rule out the possible existence of the condition." *Id.* In support of its position, the court stated:

> Fibromyalgia, previously called fibrositis, is 'a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments and other tissue.' It is a chronic condition, causing 'long-term but variable levels of muscle and joint pain, stiffness and fatigue.' The disease is 'poorly-understood within much of the medical community [and] . . . is diagnosed entirely on the basis of patients' reports and other symptoms.' Clinical signs and symptoms supporting a diagnosis of fibromyalgia under the American College of Rheumatology Guidelines include 'primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body." Fibromyalgia can be disabling. What makes fibromyalgia difficult to analyze in the social security disability context is the lack of objective symptoms:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a

rheumatic character– multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. Of course, the difficulty of analyzing the effect of fibromyalgia is not reason to ignore its presence.

*Id.* (emphasis added).  In this case, Cannon made a "de minimus" showing of medical severity in regards to fibromyalgia.

However, the ALJ's error was harmless.  *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005)(recognizing that harmless error analysis is applicable if "no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way"(quotation omitted)).  The Tenth Circuit has held that "disability determinations turn on the functional consequences, not the causes, of a claimant's condition, and '[t]he mere diagnosis of [fibromyalgia], of course says nothing about the severity of the condition.'"  *Scull v. Apfel*, No. 99-7106, 2000 WL 1028250, at **1 (10th Cir. July 26, 2000)(quoting *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)); *see also, Heinritz v. Barnhart*, No. 05-5208, 2006 WL 2294850, at *4 (10th Cir. Aug. 10, 2006)("An ALJ is required to consider the limitations that a given impairment has on the claimant's abilities to work rather than the label given to a disease or ailment.").

In *Brown*, the Tenth Circuit noted that "the principal symptoms [of fibromyalgia] are pain all over, fatigue, disturbed sleep, stiffness, and . . . multiple tender spots . . . ."  *Id.*  In this case, although the ALJ did not find that Cannon's fibromyalgia was a severe impairment, nonetheless, he evaluated the "functional consequences" of her condition.  Cannon contends that, as a result of the fibromyalgia, she "has suffered with diffuse body pain and has taken various medications for her pain."  Pl.'s Mem. in Supp. of Mot. to Remand at 9.  However, the ALJ did consider

14

Cannon's pain but found it was not as severe as she alleged and not debilitating.  Substantial evidence supports this finding.

The record indicates that On January 16, 2001, Cannon's fibromyalgia was stabilized on **Lortab 180 per month**.  Tr. 389.  On  August 7, 2001, Dr. Abel reduced this to **Lortab 140 per month**.  Tr.  365.  At this time, Cannon was "pulling 2 twelve hour shifts" at the nursing home. Tr. 356.  On October 5, 2001, Dr. Abel noted Cannon's fibromyalgia was responding well to MS Contin and that Cannon was feeling better.  Tr. 347-349, 350.  On January 16, 2002, Dr. Abel noted, "continued on long term narcotics and is doing much better functionally."  Tr. 341.  On March 18, 2002, Cannon reported her chronic pain was better on MS Contin but requested an increase in her dosage.  Tr. 332.  On June 25, 2002, Dr. Abel assessed Cannon with "a generalized flare up of fibromyalgia but was unsure of the cause."  Tr. 321-321.  On August 12, 2002, Dr. Abel noted that Cannon's chronic pain was under better control with MS Contin.  Tr. 316-317.  On September 18, 2002, Dr. Abel noted Cannon "had a functional capacity exam which qualified her for light duty."  Tr. 313.  On October 9, 2002, Dr. Abel noted Cannon's fibromyalgia was stabilized.  Tr. 311-313.  On February 3, 2003, Dr. Abel noted that Cannon looked well and her fibromyalgia was the same.  Tr. 674.  On April 2, 2003, Cannon requested a letter authorizing an exercise machine.  Tr. 669-670.  On August 20, 2003, Dr. Abel opined that the Effexor was helping Cannon's fibromyalgia.  Tr. 651.  On January 27, 2004, Cannon had her annual exam with Dr. Abel and reported she "was doing well."  Tr. 636-638.  Dr. Abel noted that Cannon's **MS Contin had been scaled down to 90 per month**.  Tr. 637-638.  On April 20, 2004, Dr. Abel noted Cannon was tolerating MS Contin well.  Tr. 624.  On October 21, 2004,

Dr. Abel noted that Cannon looked well and was "still taking MS Contin but at a lower dose." Tr. 45.

Thus, although the ALJ erred in not finding Cannon's fibromyalgia severe at step two, because he considered the functional consequence of her condition, the error was harmless and a remand on this basis would result in futile and costly proceedings. *See Seever v. Barnhart,* No. 05-5218, 2006 WL 1902066, at *3 n.1 (10th Cir. July 12, 2006).

The same holds true for Cannon's migraine headaches. The ALJ addressed Cannon's complaints of debilitating pain due to migraine headaches. Tr. 69 ("[S]he alleges debilitating pain as a result of . . . migraines."). However, the ALJ, based on his credibility determination, also found that the pain from her migraines was not debilitating. *Id.* Substantial evidence also supports this finding. *See, e.g.*, Tr. 328-329 (headaches had improved or lessened on Zoloft),  Tr. 334 (headaches had gotten better), Tr. 335 (headaches better on Axert), Tr. 343 (doing well as far as her migraine headaches on the current regimen), Tr. 350 (headaches better on Tomax), *see also*, Tr. 373,  Tr. 374.

## C. Listing of Impairments

Cannon alleges the ALJ erred in finding that her knee impairment did not meet the requirements for Listing 1.02 and 1.03. Cannon contends there is no basis for the ALJ's finding that her condition did not result in an inability to ambulate effectively as defined in Listing 1.00(b)(2)(b). To support her contention, Cannon relies on the following: (1) Dr. Schwartz' opinion that she could either stand or walk less than one hour at a time, up to a maximum of less than one hour in an 8 hour day, (2) Dr. Bair's restriction that Cannon stand no more than 15

minutes at a time, and (3) Dr. Elliott's restriction that she could stand or walk up to 10-15 minutes at a time.

At step three of the sequential evaluation process, the ALJ found "no evidence to suggest that the claimant's condition results in an inability to ambulate effectively as defined in Section 1.00(b)(2)(b) of the Listing of Impairments and as required by Listing 1.02 and 1.03." Tr. 69. Section 1.00(B)(2)(b)(1) & (2) state:

> b.  What We Mean by Inability to Ambulate Effectively
>
> (1)  Definition:  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
>
> (2)  To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt P, App. 1, §§ 1.00(B)(2)(b)(1) & (2) . The Commissioner argues that Cannon falls far short of proving that she had an inability to ambulate as required by Listings 1.02 and 1.03.  The Court agrees.   Although Cannon required the use of crutches after her knee surgery as prescribed by Dr. Bair on March 4, 2002, this was not a permanent requirement. *See* Tr. 225, 226, 228, 229, 278, 284, 288.  Moreover, on September 16, 2002, Dr. Elliott found Cannon was able to work in a light duty capacity.  Tr. 277.  Dr. Elliott opined Cannon could lift up to 20 lbs. maximum, limited standing and walking to 15 to 30 minutes at a time, limited to

occasional Cannon's ability to bend, squat and climb stairs, and found Cannon should not squat or climb stairs.  *Id.*  Significantly, Dr. Elliott opined Cannon could work an 8 hour day.  *Id.*

Cannon relies on Dr. Schwartz' opinion that she could either stand or walk less than one hour at a time, up to a maximum of less than one hour in an 8 hour day.  However, the ALJ gave little weight to Dr. Schwartz' opinion and gave his reasons for his decision.  Tr. 71.  Significantly, Cannon does not challenge the weight the ALJ afforded Dr. Schwartz' opinion.  A review of the record shows that substantial evidence supports the ALJ's decision to give Dr. Schwartz' opinion little weight.

Finally, Cannon relies on her testimony at the administrative hearing.  However, the ALJ did not find Cannon credible and this finding is supported by substantial evidence.  Additionally, Cannon reported that she drove herself to her doctors' appointments, went shopping on her own, and was able to care for her elderly father after his surgery.  Accordingly, the Court finds that the ALJ's determination that Cannon did not meet Listings 1.02 and 1.03 was proper and supported by substantial evidence.

**D.  Residual Functional Capacity (RFC) Determination**

A claimant's residual functional capacity is the most the claimant can still do despite his/her limitations.  20 C.F.R. §404.1545(a)(1).  At step five, the Commissioner bears the burden of proving by substantial evidence that the claimant retains the RFC to perform work at some level lower than his/her past relevant work.  *Thompson,* 987 F.2d at 1491.  The claimant bears the burden of proof at steps one through four.  *See Nielsen v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).  The claimant's RFC is determined once, in detail, at step four.  *See* 20 C.F.R. § 404.920(e); SSR 96-9p, 1996 WL 374185, at *2, *5-*9; SSR 96-8p, 1996WL 374184, at *5-*7;

SSR 86-8, 1986 WL 68636, at *4; *see also Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir.

1996).  If the evaluation of the claim proceeds to step five, the same RFC finding is considered

along with other factors to determine whether  the claimant can perform work other than his or

her past relevant work.  *See* 20 C.F.R. § 416.920(f); SSR 86-8, 1986 WL 68636, at *7.

Cannon contends the ALJ's finding that she retained the RFC to lift and carry fifteen

pounds, sit for one hour at a time, and stand and/or walk for ten to fifteen minutes at a time was

inconsistent with a finding that she could perform light work.  Pl.'s Mem. in Supp. of Mot. to

Remand at 14.  However, the ALJ found Cannon could not perform her past relevant work as a

registered nurse which was classified as medium work (Tr. 792) "because she was limited to a

restricted range of light work."  Tr. 72.  Specifically, the ALJ found:

> The claimant's age, education, and vocationally relevant past work experience, if any, must
> be viewed in conjunction with the medical-Vocational Guidelines of Appendix 2 of Subpart
> P of the Regulations, which contain a series of rules that may direct a conclusion of either
> "disabled" or "not disabled" depending upon the claimant's residual functional capacity and
> vocational profile.
>
> Born June 10, 1963, the claimant is currently 41 years old.  This is defined in the regulations
> as a younger individual (20 C.F.R. 404.1563).  She has more than a high school (or high
> school equivalent) education, and she has transferable skills from skilled work previously
> performed.  At the hearing, the impartial vocational expert identified transferable skills
> possessed by the claimant.  These included extensive medical knowledge as well as extensive
> knowledge of medical records.  The vocational expert also testified that such skills would
> transfer to semi-skilled jobs within the claimant's residual functional capacity as a Hospital
> Admitting Clerk and Hospital Records Clerk.  The undersigned concurs with the testimony
> of the vocational expert, and finds the claimant has the aforementioned transferable skills.
>
> The Medical-Vocational Guidelines are used as a **framework** for the decision when the
> claimant **cannot perform all of the exertional demands** of work at a given level of exertion
> **and/or has any non-exertional limitations**.  Based upon the claimant's residual functional
> capacity, she is capable of performing a **significant range of light work** as defined in 20 CFR
> §404.1567.
>
> Light work involves lifting no more than 20 pound at a time with frequent lifting or carrying
> of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job
> is in this category when it requires a good deal of walking or standing, or when it involves

sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods.

If the claimant were capable of performing the **full range of light work**, a finding of "not disabled" would be directed by the Medical-Vocational Guidelines. <u>The claimant's ability to perform all or substantially all of the requirements of light work is **impeded** by additional exertional and/or non-exertional limitations. Under such circumstances, an impartial vocational expert may be used to help determine whether or not there are a **significant number of jobs** in the national economy the claimant can perform given her residual functional capacity, age, education, and past relevant work (the vocational profile).</u>

The Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual of the claimant's age, education, past relevant work experience and residual functional capacity as determined. The vocational expert testified that, presuming the hypothetical individual's specific work restrictions, she is capable of making a vocational adjustment to other work. The vocational expert testified that, given these factors, the claimant could work as an Office Helper (a light, unskilled job with 845 positions in the region and 15,574 positions in the nation); a Cashier (sedentary, unskilled job with 579 positions in the region and 250,173 positions in the nation); an Order Clerk (a sedentary, unskilled job with 1,999 positions in the region and 610,007 positions in the nation); and, a Security Systems Monitor (sedentary, unskilled job with 659 positions in the region and 16,307 positions in the nation).

<u>Based on the testimony of the vocational expert,</u> the undersigned concludes that, considering the claimant's age, educational background, work experience, and residual functional capacity, <u>she is capable of making a successful adjustment to work that exists in significant numbers in the national economy.</u> A finding of "not disabled" is therefore, reached with the framework of Medical-Vocational Rule 202.22.

For all the foregoing reasons, the Administrative Law Judge concludes that the claimant retains a capacity for work that exists in significant numbers in the national economy, and that she is not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g) ).

Tr. 72-73 (emphasis added). Thus, based on the medical record, including consideration of

Cannon's allegations of disabling pain and the testimony at the hearing, the ALJ concluded at step

four that Cannon could not perform her past relevant work, but that she retained the residual

functional capacity to perform a "significant range of light work." Tr. 72. Moving to the fifth and

final step in the sequential process, and based on hypothetical questions posed to a vocational

expert (VE), the ALJ determined that there were sedentary and light jobs which Cannon was able to perform.[2]

Cannon contends that, because her ability to stand is limited to about 10 to 15 minutes at a time, as a matter of law, she is unable to perform jobs defined as being light in strength demand. Pl.'s Mem. in Supp. of Mot. to Remand at 16.  At the administrative hearing, the following colloquy transpired between the ALJ and the VE.

ALJ:    But you have reviewed the vocational record and you've heard the testimony?

VE:     Yes.

**    **  **  **  **

VE:     She was a nurse, registered nurse.  The DOT 075.364-010 and that's considered skilled, SVP 7, that's a medium level exertion.

ALJ:    Okay.  And that about it?

VE:     Yeah.  she did that throughout her career for different places, your honor.

ALJ:    If we were to consider now hypothetically an individual the age, educational background, experience of the claimant.  We would find this individual is limited to a lifting limit of say 15 pounds, the individual can sit for an hour at a time.  But

---

[2] Although Cannon contends the ALJ erred in conclusively applying the Medical-Vocational Guidelines, the ALJ's decision is clear that he used the Medical-Vocational Guidelines as a framework to guide his decision.  This was proper under the regulations.  *See*, 20 C.F.R. § 404.1569a(d)("If your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength and demands of jobs other than the strength demands, we will not directly apply the rules in appendix unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rules provide a framework to guide our decision.").

then standing's limited to about 10 or 15 minutes at a time.  Would the individual

described be able to do any of the past relevant work?

VE:     No, your Honor.  The exertional level was at the medium level.

ALJ:    Any transferable skills to jobs that would accommodate that hypothetical?

VE:     The, the skills gained in the, in the position would transfer to such jobs as

admitting clerk and medical records clerk because of her knowledge of skills in

applying medical service and record keeping and knowledge of medical

terminology.  The medical clerk is considered a light job, that would be a

possibility.  The admitting clerk is pretty much a sedentary job:  There's two

clerks, one's outpatient admitting clerk and the other's admitting clerk too, to a

hospital, and they're both sedentary and pretty much that's limited to sitting down

most of the time.

ALJ:    Now, that's the admitting clerk?

VE:     Yeah.  The admitting clerk and the —

ALJ:    Sedentary and that'd be skilled, right?

VE:     Yes.  That's semi-skilled, your Honor.

ALJ:    Semi-skilled.

VE:     Yeah.

ALJ:    Okay.  And do you have a DOT on that?

VE:     The DOT on the admitting clerk is 205.362-018.

ALJ:    Okay.

22

VE:    The medical– that's a SV 4, it's sedentary.  The medical records clerk is 245.362-010.  That's considered semi-skilled but it's a light.  That, that would be more appropriate.

ALJ:   It's a light job?

VE:    It's a light job.

ALJ:   Would it require duties in excess of the hypothetical?

VE:    I don't believe so.  There's hardly any lifting required, Your Honor.

Tr. 791-793.  Cannon's counsel questioned the ALJ as follows:

ATY:   Let me just clarify one thing.  When you did the office helper and cashier, was office helper where– was that sedentary or light?

VE:    That's light.

ATY:   Okay.  I had marked it wrong, I'm sorry.

ALJ:   Office helper would be a light job?

VE:    Yeah, light.

ALJ:   Still accommodate the hypothetical?

VE:    That's correct, that's correct.

ALJ:   Okay.

ATY:   Okay.  Now, if this person– if we start with the hypothetical here of the sitting one hour at a time, standing 10 to 15 at most, but were to assume that the total in a workday was two to four hours and that stand and walking were less then one hour total in a day– wait, I'm going to separate those.  Let me go back, I'm sorry.

23

Start with that with the alternation position that assume maximum sitting was up to two to four hours per day.

VE:     Okay.

ATY:   With the same reduced tolerance for one hour and the standing was still 10 to 15 minutes, but that she can't sit the six hours per day that sedentary work would require.  How would that affect the jobs that you've proposed?

VE:     The– at, at the sedentary level are you talking about? Or both the sedentary and light?

ATY:   Well, I would assume that if you could only stand and walk 10 to 15 minutes at a time you really can't do light work.

VE:     That's correct.

ATY:   Okay.  So really just that part of the hypothetical, the 10 to 15 minutes limitation standing at one time is not going to get you up to the tolerance to do the six hours per day of standing required for light work?

VE:     No.  Not with those intervals.  That's correct.

ATY:   Okay.  So we basically– given the limitations standing and walking, that would pretty well eliminate light work?

VE:     That's correct.

Tr. 794-796.   Based on this exchange, Cannon argues that, as matter of law, she cannot perform the jobs of office helper and cashier.

24

The Commissioner counters that just because Cannon cannot perform the full range of light work does not mean she cannot perform the jobs listed by the VE.  The Commissioner also argues that the Dictionary of Occupational Titles (DOT) gives the approximate maximum requirements for each position rather than their range.  *See Haddock v. Apfel*, 196 F.3d at 1092 (citing *Fenton v. Apfel*, 149 F.3d 907, 911 (8th Cir. 1998)(explaining that DOT gives maximum requirements of job as generally performed, not range of requirements as job is performed in various particular settings)).  Because a VE is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed, the ALJ is entitled to rely on his testimony to find a claimant not disabled.  According to the Commissioner, in this case, the VE considered Cannon's situation and found jobs that accommodated her abilities and limits, i.e., office helper and cashier in the light range.

Social Security Ruling 83-12 supports the Commissioner's argument.  Social Security Ruling 83-12 discusses a category of cases in which a claimant's nonexertional limitations place him/her between categories and advises that "a [vocational expert] should be consulted to clarify the implications for the occupational base."  SSR 83-12, 1983 WL 31253, at *2.  Specifically Social Security Ruling 83-12 states:

> In some instances, an individual can do a <u>little more or less than the exertion specified for a particular range of work</u>, e.g., the person is considered to be physically capable of meeting the exertional demands of light work except that he or she can lift no more than 15 pounds at a time rather than 20 pounds, or he or she can fully meet the exertional demands of light work and can also perform part of the greater lifting requirements of medium work (such as up to 30 pounds rather then 50 pounds at a time).

** ** ** ** ** **

> Where an individual's exertional RFC does not coincide with the definition of any one of the ranges of work as defined in sections 404.1567 and 416.967 of the regulations, the occupational base is affected and <u>may or may not represent a significant number</u>

25

of jobs in terms of the rules directing a conclusion as to disability. The [ALJ] will consider the extent of any erosion of the occupational base and access its significance. In some instances, the restriction will be so slight that it would clearly have little effect on the occupational base. In cases of considerably greater restriction(s), the occupational base will obviously be affected. In still other instances, the restrictions of the occupational base will be less obvious.

Where the erosion of the occupational base is not clear, the [ALJ] will need to consult a vocational resource. The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient for relatively simple issues. In more complex cases, a person or persons with specialized knowledge wold be helpful. State agencies may use personnel termed vocational consultants or specialists, or they may purchase the services of vocational evaluation workshops. Vocational experts may testify for this purpose at the hearing and appeals levels.

*Id.* at *1-*2 (emphasis added). This is preciously the procedure the ALJ followed in this case.

The Court has closely reviewed the transcript of the Administrative Hearing and finds that the VE made it clear that he was accommodating Cannon's limitations for the cashier position when he stated "I also would use a cashier with a sit/stand option." Tr. 794. However, the VE did not elaborate as to the office helper position. Nonetheless, the ALJ met his burden at step five by showing there were significant jobs Cannon could perform when the jobs of cashier, order clerk, and surveillance monitor are considered. *See Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1992)(identifying factors ALJ should consider in determining what constitutes a "significant number" of jobs).

Although Cannon contends that she cannot perform jobs at the sedentary level, the evidence does not support her contention. Cannon relies on Dr. Schwartz' opinion in support of her assertion that her total sitting tolerance during an 8 hour day is for up to 4 hours. Pl.'s Mem. in Supp. of Mot. to Remand at 17 (citing to Tr. 579). However, the ALJ gave Dr. Schwartz opinion very little weight and gave more weight to the opinions of Drs. Elliott and Bair. Tr. 71.

Drs. Elliott and Bair did not opine that Cannon's total sitting tolerance during an 8 hour day was for up to 4 hours and the record does not support this limitation.

Finally, Cannon argues that the ALJ's hypothetical question failed to include all her limitations. However, the ALJ need only reflect impairments and limitations that are borne out by the evidentiary record. *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995). Moreover, the ALJ was not required to accept the answer to a hypothetical question that included limitations claimed by Cannon but not accepted by the ALJ as supported by the record. *Id.* Here, the Court has already affirmed the ALJ's finding with respect to Cannon's impairments and her credibility. Because these findings are accurately reflected in the ALJ's hypothetical questions, the VE's testimony provided substantial evidence that there were significant number of jobs in the local and national economies which Cannon could perform.

**E.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner. *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994). The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied. Thus, in light of the narrow scope of the Court's review, the Court is satisfied that substantial evidence supports the ALJ's determination that, despite her limitations, Cannon could perform a significant number of jobs that exist in the national economy. Accordingly, the ALJ's finding of nondisability is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.


**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

# APPENDIX  A

**MEDICAL RECORDS**

**LOUISE ABEL, M.D.**

On **January 16, 2001**, Dr. Abel saw Cannon for the first time.  Tr. 389-391.  Cannon's "chief complaint" was listed as "new patient, pt has fibromyalgia– in constant pain.  Would like referrals.  Has list of medications she's taking now."  Tr. 389.  Cannon reported the following past medical history: (1) **fibromyalgia, severe with multiple drug intolerances.  Currently stabilized on Lortab 180 per month**; (2) migraine headaches– seen by Dr. Guggenheim in past and prescribed Amerge; (3) esophagitis treated with Reglan; (4) bilateral tendon transplants in knees; (5) chondromalacia; and (6) hysterectomy, appendectomy, presacral neurectomy (a procedure used in the treatment of pain associated with endometriosis), ilioinguinal neurectomy. Tr.389.  Under review of systems, **Cannon reported no problems** or changes (including no new joint pains or swelling) other than right lower quadrant pain and requested a referral to a Dr. Fullerton.  Tr. 390.  The physical examination was normal.  Dr. Abel assessed Cannon with fibromyalgia and noted she would "keep same regimen."  *Id.*  Dr. Abel ordered an ANA and RF "due to family history of arthritis and lupus" as reported by Cannon.  *Id.*  **Dr. Abel refilled Cannon's prescriptions and noted, "I explained that no one else can renew these for now**." Tr. 391.  Dr. Abel prescribed the following medications: (1) Zestril 10 mg, one tabled every day, quantity 30, 11 refills; (2) Paxil 40 mg, one tablet every morning, quantity 30, 12 refills; (3) Lortab 7.5 mg (narcotic/opioid pain medication), one to two tablets every 4-6 hours, quantity 180, zero refills; (4) Levothroid 0.112 mg one every day, quantity 90, 3 refills; (5) Estrace 1 mg,

1

one tablet every day, quantity 30, 11 refills; (6) Soma 350 mg (pain medication), one to two

tablets at bedtime as needed, quantity 60, zero refills; (7) Klonopin (for anxiety) 1 mg, one tablet

at bedtime as needed, zero refills; (8) Ativan (for anxiety) 1 mg, one tablet three times a day as

needed, quantity 60, zero refills.

On **February 14, 2001**, there is a note by one of **Dr. Abel's office staff indicating Dr.**

**Abel had given Cannon a "small refill for [Cannon] yesterday on Lortab for 22 pills."  Tr.**

**388.  On this day, Cannon was calling in for 8 more Lortab pills and for 10 more Ativan**

**and indicated she was leaving town and needed them as soon as possible**.

On **February 20, 2001**, Cannon returned to see Dr. Abel "to discuss meds, stress, labs."

Tr. 387-388.  Dr. Abel informed Cannon that **all her lab work was normal** and discussed stress

reduction and exercise.  Dr. Abel noted, "**looks well, no acute distress**."  Tr. 388.  Dr. Abel

refilled her medications.

On **February 28, 2001**, Cannon called Dr. Abel's office and left a message requesting Dr.

Abel to call in a prescription for acne because she would not be able to see Dr. Kaczmarek until

March.  Tr. 387.

On **March 5, 2001**, Cannon called Dr. Abel's office requesting a referral to Dr. Deanna

Duran for a left ingrown toenail.  Tr. 386.  Dr. Abel approved the referral.

On **March 6, 2001**, Cannon called Dr. Abel's office requesting a referral to "Pain Clinic

for scar tissue at RLQ from endometriosis type surgeries."  Tr. 386.  Cannon requested a referral

to either Dr. Fullerton or Dr. Hines.

On **March 8, 2001**, Cannon called Dr. Abel's office requesting a prescription refill.  Tr.

385-386.  Specifically, **Cannon wanted a "refill on her Lortab 7.5 and her Ativan**."  Tr. 386.

Cannon reported "she was in a lot of pain" and "wanted to let [Dr. Abel] to know that she will be **getting her toe worked on Monday**." *Id.* Dr. Abel prescribed Ativan, quantity 60 with zero refills (Tr. 386) and Lortab, quantity 180 with zero refills (Tr. 385- last filled 3/08/01 for #180 w/no refills).

On **March 26, 2001**, Cannon called Dr. Abel's office requesting a prescription refill. Tr. 385. **Cannon requested a refill of her Lortab and "wants [Dr. Abel] to know she has appt with the Pain Clinic next week**." *Id.* Dr. Abel authorized a refill for the Lortab but noted, "OK to refill but I would like to see her in April to refill this in person next time and to see how her eval[uation] at pain clinic went." *Id.*

On **March 27, 2001**, there is a note indicating Dr. Abel wanted Cannon to come in "tomorrow." Tr. 385. Cannon informed the office that she could come in during her lunch at 1:00. On the same day, there is another note to **Dr. Abel that "pt has tried Lortab for above [fibromyalgia] (just rx.ed this wk, I think) not helping inflammation pain**." Tr. 384.

On **March 28, 2001**, Cannon returned as requested for an evaluation with Dr. Abel. Tr. 383-384. Cannon complained of "migraines and terrible head to toe body pain. Off and on for the past 3-4 weeks. Really bad for the past 2 days. Lortab is not helping, wondering about steroids." Tr. 383. Dr. Abel noted tenderness over the mandible and jaw area, the trapezius muscles, and the paraspinal muscles. Tr. 384. Dr. Abel referred Cannon to Dr. Sokoloff. **Dr. Abel also noted Cannon was "on lots of Lortab and that may be exacerbating rather than helping."** *Id.* **Dr. Abel also noted Cannon had "a lot of financial stress now as she is in debt $20,000."** *Id.* Dr. Abel prescribed Nortriptyline HCL 10 mg (for depression), one tablet at bedtime, quantity 60, 2 refills and refilled Cannon's Ativan (quantity 60 with no refills).

3

On **April 11, 2001**, Cannon called Dr. Abel's office "requesting a refill on her Reglan, which Dr. Amer had always Rx'd in the past."  Tr. 383.  The assistant noted, "You have never Rx'd this to her.  **Also she would like to know if she could have a referral to Dr. Guggenheim re: her migraines**."  *Id.*

On **April 16, 2001**, Cannon called Dr. Abel's office requesting "**a refill on her Lortab she says she has enough for today**."  Tr. 382.  The assistant noted, "she has an appt with you on Wednesday."  **Dr. Abel refilled the Lortab but noted, "I am concerned that she has used 180 [Lortab] in 3 weeks.  Will give small amount**."  *Id.*

On **April 18, 2001**, Cannon returned for a follow up visit with Dr. Abel.  Tr. 381. Cannon reported she had gained weight since starting the Nortriptyline.  **Cannon also reported she was using "more Lortab due to toe infection and increased pain**."  Tr. 382.  Cannon was also taking Nortriptyline at bedtime with no "real effect yet but sleeping a little bit better and was seeing "pain center and going to have injection soon."  *Id.*  **Dr. Abel noted Cannon looked well and was in no acute distress**.  **Dr. Abel also noted Cannon would be seeing Dr. Guggenheim and opined Cannon was using too much Lortab and "will cut down now**."  *Id.*

On **April 27, 2001**, Cannon called Dr. Abel's office.  The assistant forwarded the message to Boudinot Atterbury, M.D.  Cannon called to inform Dr. Abel that she had "injections at pain clinic done for her migraines but she had an adverse reaction to them" and was now having worse pain and wanted narcotic analgesics without Tylenol to help her.  The assistant noted that Cannon was a Patient of Dr. Abel.  Tr. 381.

On **April 30, 2001**, Cannon called Dr. Abel's office.  Tr. 380.  Cannon complained of "dibilitating (sic) pain" and reported she had gone "to the pain clinic last Monday and "had an

adverse reaction w/ the injections." *Id.* **Cannon claimed she had seen Dr. Frank at the pain clinic and wanted medicine for the pain because her jaw was extremely bad**.

On the same day, **April 30, 2001**, Dr. Atterbury noted under the "Subject" heading of the progress notes: **? narcotic abuse** and left Dr. Abel this message, "You wrote Rx for Lortab 180 tabs on 4/18. **She is now asking for pain med 'without tylenol.' I called Albertson's pharmacy and a dentist had recently given her Rx for small amount of Lortab**." Dr. Abel responded, "I will ask her to come in." *Id.* Dr. Abel also prescribed **OxyContin** 20 mg, one tablet twice a day, quantity 60, zero refills.

Cannon came in on that day to see Dr. Abel complaining of **jaw pain, radiating, since she went to the pain clinic and "possible infected left big toe nail**." Tr. 378. Dr. Abel noted Cannon had been to the **Pain Clinic and received "an injection for the trigeminal nerve and subsequently had more pain with burning feeling up her head and face**." *Id*. **Cannon reported she was doing better**. The physical examination was essentially normal. Dr. Abel noted, "toenail got infected but is responding to **topical AB** (antibiotic) and "toenail healing with minimal erythema." *Id*. Dr. Abel assessed Cannon with "headache-migraine" and noted Cannon was planning to see Dr. Guggenheim "soon for re evaluation." Tr. 379. **Dr. Abel cautioned Cannon about taking too many Lortab**. Cannon requested a "non tylenol compound for pain to alternate" and reported she "**still had not seen anyone for the fibromyalgia**." Tr. 380. Dr. Abel directed Cannon to continue with the Nortriptyline another week.

On **May 4, 2001**, Cannon called Dr. Abel's office requesting a refill of her Ativan. Dr. Abel prescribed Ativan, quantity 90, zero refills. Tr. 378.

5

On **May 11, 2001**, Cannon called Dr. Abel's office **requesting a refill of her Lortab**.  Tr. 377-378.  **Dr. Abel did not authorize the prescription refill**.  Tr. 378.

On **May 21, 2001**, Cannon was "in for rx refills, and to tell [Dr. Abel] what Dr. Guggenheim is suggesting."  Tr. 375.  **Cannon reported she was in "so much pain this weekend that she threw up**."  *Id*.  Dr. Abel noted:

> Pt had **severe jaw pain this weekend with nausea and vomiting**.  She is **requesting injectable Demerol for her pain**.  She was seen in the ER last week and given an injection of Demerol and then felt fine for one day.  **I saw her at the nursing home on Thursday and she was participating in the wheelchair racing and seemed fine**.
>
> She said she was **shopping for clothes this weekend** as she had gained weight.

Tr. 376 (emphasis added).  Dr. Abel also noted, "**calls these migraines but actual location is left TMJ area**."  *Id*.  Dr. Abel performed a physical examination which was essentially normal except for TMJ area tenderness bilaterally but worse on the left side.  Dr. Abel assessed Cannon as follows:

> HEADACHE:  I wonder whether this is simply a flare up of TMJ.  She has severe bruxism (teeth grinding usually triggered by stress) and stopped her Klonopin recently.  She also stopped her Nortriptyline.  **She is under a lot of stress at work**.  **Some parts of her story are not consistent** (i.e., throwing up all weekend and shopping for clothes this weekend).  I suggested she try Vioxx or steroids for the inflammatory component of the TMJ and she reluctantly agreed to a medrol dose pack.  I reminded her this would help with migraine as well.  **I do not wish to give her injectable Demerol as we are not sure what the etiology is and the abuse potential is very high**.  I recommend she restart the klonopin.  **I think her sedentary job working on the computer is probably not the best for her**.  Will discuss next visit.  She is planning botox injections from Dr. Guggenheim for the jaw area.  Copy of this note to Dr. Guggenheim.
>
> FIBROMYALGIA:  Will increase the Paxil to 60 mg daily to see if this will help.  She seems very stressed and this has worked best for her.

Tr. 377 (emphasis added).

6

On **May 25, 2001**, Cannon called Dr. Abel's office and left a message that she was in "a lot of pain." Tr. 375. The assistant noted Dr. Abel would call Cannon.

On **May 29, 2001**, Cannon c**alled Dr. Abel's office crying requesting Lortab because "it was the only thing that works" for her migraines**. Tr. 374. Dr. Abel noted:

> I called her yesterday and she feels she is still having a lot of trouble sleeping. Headaches are daily. She is planning botox with Dr. Guggenheim. I called **Dr. Guggenheim** and discussed her headaches and **she feels that pt does not have a clear diagnosis** and she is depressed. She recommended psych consultation with Dr. Lustbader.

Tr. 374.

On **May 30, 2001**, Cannon called Dr. Abel's office regarding her Ambien prescription. Tr. 375. Apparently, her insurance did not cover the Ambien and wanted another sleep aide that was covered by her policy.

On **May 31, 2001**, Cannon called Dr. Abel's office requesting samples of Amerge or Zomig if Dr. Abel did not have the Amerge. Dr. Abel approved Zomig samples.

On **June 11, 2001**, Dr. Frank called and informed Dr. Abel that he did not "feel further injections are going to be helpful for [Cannon]. Tr. 373. **Dr. Frank was "concerned about her requesting IV narcotics for her sudden acute headache pain which developed when the IV heplock was placed**." *Id.* The record indicates that **Dr. Frank informed Dr. Abel that "On the second occasion when this happened she left the Pain Clinic and went to ER to get IV Demerol when [he] refused to giver her IV Demerol.**" *Id.* Significantly, Dr. Abel noted:

> I tried calling her back at Casa Real but she did not answer. I am reluctant to give her sleeping pills as she is highly dependent on multiple drugs and **has a few confirmed diagnoses at this time**. I am going to encourage her to FU with **Dr. K. Guggenheim as she has known her for 3 years. I have also in the past asked her to see someone about her fibromyalgia. I am very concerned about narcotics abuse and addiction in this pt."**

Tr. 373 (emphasis added).

7

On **June 21, 2001**, there is a message to Ximena Garcia, M.D.  Tr. 372.  The message indicated that the answering service "sent a message over the fax for [Dr. Abel] to call Dr. Guggenheim."   The individual called Dr. Guggenheim "to see if we could help her with anything and she says she would like [Dr. Garcia] to call her."   Dr. Guggenheim informed the individual that she was "wondering what is going on with this patient."  *Id.*  The 6/11 note was discussed.

On **July 2, 2001**, Cannon called Dr. Abel's office requesting a **refill of her Ativan** because **Dr. Ximena Garcia only gave her "a couple of pills**."  Tr. 372.  **Dr. Abel noted, "She was given #90 on June 4th.  She feels that the pharmacy shorted her on pills.  Dr. Garcia gave her 15 pills last week until I got back.  I told her we will talk about it when I see her on July 9th**."  *Id.*

On **July 5, 2001**, Cannon called requesting a refill of the Amerge.  Tr. 371.  Dr. Abel prescribed Amerge 2.5 mg, quantity 12, with 6 refills.

On **July 9, 2001**, Cannon returned to see Dr. Abel with complaints of "stomach problems."  Tr. 370-371.  Cannon informed Dr. Abel that she was keeping a diary of headaches for Dr. Guggenheim.  Cannon complained of indigestion and bloating.  Dr. Abel noted Cannon's headaches were not occurring every day.  **Cannon stated she was "aware that her current job is more stressful and thinks something more active where she can walk around and less stress might be better**."  Tr. 371.  Cannon requested a referral to see Dr. Brown and said Dr. Guggenheim had recommended this.  Dr. Abel refilled Cannon's Ativan 1 mg, quantity 90, with zero refills.

On **July 19, 2001**, Dr. Abel's records indicate Cannon was seen at the emergency room for migraine headache.  Tr. 369.  Cannon had been treated with **Demerol and Vistaril**.

On **July 20, 2001**, Cannon left a message for Dr. Abel.  Cannon was requesting more Amerge.

On **July 23, 2001**, Dr. Abel's records indicate Cannon was seen at the emergency room for a migraine headache.  Tr. 369.  Cannon had been treated with **Demerol and morphine**.

On **July 25, 2001**, Cannon left a message for Dr. Abel **requesting a referral for Dr. Lakind**.  Tr. 368.  **Dr. Abel noted that Cannon already had a neurologist and preferred she see Dr. Guggenheim**.  When Cannon was informed of Dr. Abel's decision she did not agree and demanded a referral to Dr. Lakind and had already scheduled an appointment for August 7th.  She informed Dr. Abel's staff that if Dr. Abel did not agree she could always get another PCP (primary care physician) and needed to "hear from her TONIGHT."   Dr. Abel authorized the referral for Dr. Lakind.

On **July 30, 2001**, Cannon returned to see Dr. Abel with complaints of "swollen hands." Tr. 366-367.   Dr. Abel was not in so Dr. Atterbury took care of her.  She complained of  hand, leg, and knee edema for one day and informed the assistant that her ENT was considering the possibility of a lupus diagnosis.  Cannon also complained of body pain.  Dr. Atterbury noted Cannon looked well and was in no acute distress but appeared uncomfortable.  Tr. 367.  The examination showed "puffiness" in her hands  and she could make a fist "almost all the way."  *Id.* Dr. Atterbury assessed Cannon with "trace peripheral edema."  *Id.*  Dr. Atterbury noted "fibromyalgia– ? SLE has plans to see Dr. Abel next week and Dr. Lakind thereafter."

On **August 1, 2001**, Cannon called the office and left a message that Dr. Atterbury had talked to her about getting some "medrol packs" and requested a prescription be sent to Albertson's pharmacy.  Dr. Atterbury instructed her assistant to call Cannon and inform her that

she misunderstood her.  According to Dr. Atterbury, they discussed the fact that Dr. Abel had

prescribed her a medrol dose pack  that did not work before.  However, Dr. Atterbury said that if

Cannon wanted to try again then she could have one dose pack.

On **August 7, 2001**, Dr. Abel's office received a telephone call providing the following

information:

> TC FROM A GENTLEMAN STATING THAT HE IS A FRIEND OF PT'S.  WOULD
> LIKE FOR [DR. ABEL] TO KNOW A FEW THINGS.  **HE STATES THAT PT. IS A
> SUBSTANCE ABUSER AND THAT THE NARCOTICS THAT THE PT. HAS BEEN
> RX'D HAS EITHER BEEN SOLD OR GIVEN TO HER BOYFRIEND THAT HAS
> ALSO BEEN A PATIENT OF [DR. ABEL] BY THE NAME OF MARK GINNEL.**
> ROBERT ALSO STATED THAT HE KNOWS PT. FROM WORK AND THAT SHE
> DOES WORK AT CASA REAL AND ALSO THAT HE BELIEVES PT. MIGHT BE
> USING HEROIN.  HE IS CONCERNED W/ HER HEALTH.  DID NOT WANT TO
> LEAVE A NUMBER.  JUST TO PASS MESSAGE TO [DR. ABEL].

Tr. 364.

On the same day, **August 7, 2001**, Cannon returned to see Dr. Abel for a follow up and **to**

**discuss "lupus questions**."  Tr. 364-366.  Cannon complained of headaches and was going to see

Dr. Guggenheim on Thursday.  Cannon denied the information provided by "Robert."  **Cannon**

**told Dr. Abel that she was losing her job in 2 weeks and will be looking for another job.**

**"Asking about disability."**  Tr. 365.  Dr. Abel reduced the Lortab and increased the MS Contin.

Dr. Abel noted she discussed the importance of chronic pain protocol with long acting narcotics

instead of Lortab.  **Cannon agreed and said she would cut down the Lortab to 140 this**

**month and further each month**.  **Dr. Abel also directed Cannon to "increase exercise**."

On **August 13, 2001**, Cannon called Dr. Abel's office requesting a urinalysis and culture

and sensitivity order be faxed to Tricore.  Tr. 364.  Cannon self-diagnosed a bladder infection and

wanted to have these tests done at the same time she did the lab work ordered by Dr. Lakind.  Dr. Abel complied.

On **August 17, 2001**, Cannon called Dr. Abel's office requesting her lab results.  Tr. 363. Cannon complained that she still had "some discomfort."  *Id.*  Dr. Abel directed her assistant to call Cannon and have her leave a urine specimen for a urinalysis and dipstick check.  Cannon reported she could not come in that day.

On **August 20, 2001**, Cannon called Dr. Abel's office requesting her lab results.  Tr. 361. According to Cannon she went to the emergency room for right flank pain the night before.  Tr. 361.  Dr. Abel directed her to come to the office on this day.  Cannon came into see Dr. Abel later that day.  Dr. Abel noted Cannon had gone to the emergency room in Los Alamos the previous night and was found to have a **negative "urine dip**."  *Id.*  Cannon complained that she still had the same symptoms although she was feeling better.  Cannon denied chills or fever.  The emergency room physician had prescribed medication for her symptoms.  Dr. Abel performed a physical examination and also reviewed the lab results sent by Dr. Lakind.  Dr. Abel noted, "only positives: parvovirus and C reactive protein. TSH sl[ightly] elevated will increase the Levothroid."  *Id.*

On **August 22, 2001**, Cannon called Dr. Abel's office requesting more MS Contin and Tigan suppositories 200 mg.  Tr. 360. Dr. Abel prescribed MS Contin 60 mg, quantity 60 and Tigan 200 mg.

On **August 23, 2001**, Cannon called Dr. Abel's office complaining of a fever of 100 degrees.  Tr. 360.  Dr. Abel directed her to continue taking the Levaquin 500 mg for another 7 days and provided her with samples.

11

On **August 24, 2001**, Cannon returned to see Dr. Abel with complaints of kidney and abdominal discomfort, diarrhea, and dehydration. Tr. 357. Cannon claimed the Levaquin was not helping. **Dr. Abel noted her fibromyalgia was "currently stabilized."** Tr. 357. Dr. Abel assessed Cannon with pyelonephritis. Dr. Abel noted, "send to ER, may need to be admitted for further evaluation and treatment." *Id.* [See Dr. Abel's note dated **August 31, 2001**, regarding Dr. Thompson's evaluation of Cannon at the emergency room.]

On **August 27, 2001**, Cannon called Dr. Abel's office at 9:16 a.m. to report that she was at home, doing better, and did not have a fever. At 9:39 a.m. Cannon called the office requesting Difulcan because she "had yeast in her mouth." Tr. 357.

On **August 30, 2001**, Cannon called Dr. Abel's office **complaining of painful joints and requested a medrol pack**. **Dr. Abel refused to treat her without first evaluating he**r **and asked her staff to have Cannon come to the office for an evaluation because she did not** "**have a clear diagnosis of arthritis**." Cannon was upset about this and refused to come in because she thought it was a waste of money.

On **August 31, 2001**, Cannon called Dr. Abel's office to complain that her kidneys were still bothering her even though she was still on Levaquin. Tr. 356. Cannon "just wanted to inform [Dr. Abel] b/c **she has to pull 2 twelve hour shifts**." *Id.* Dr. Abel noted the following:

> According to staff she has called 10 times today. Has been verbally abusive of our staff. I saw her at Casa Real working on Tuesday when I made rounds and **she said she was much better**. The she called on Wed requesting a medrol dose pack and when asked to come in to discuss this new med for her she refused and got verbally abusive with Francesca again. Now calling to say her kidneys are hurting again. **She was seen last week by Dr. Thompson on Friday and hydrated in the ER. His impression was that she wanted out of work and not to be worked up. I have requested several times that she see a rheumatologist but she has not.** Today there is no answer at work: I had her paged all over the building. **Staff here report she was just seen at Albertson's and doing fine. No answer at home**.

12

Tr. 356 (emphasis added).

On **September 5, 2001**, Cannon returned for her scheduled appointment with Dr. Abel. Tr. 354-355.  Cannon complained of abdominal pain and also requested refills for her medications.  Cannon reported she had developed right upper quadrant pain on Friday and had a recurrence on this day after eating fried chicken the previous night.  **Cannon also reported her headaches were better**.  Dr. Abel assessed Cannon with (1) " suspicious of gallstones as her GGT was elevated in Aug. will order US (ultrasound);" (2) pyelonephritis; and (3) joint pains. Tr. 355.  Dr. Abel referred Cannon to Dr. Sokoloff for evaluation of these complaints.  **Cannon requested medrol dose pack but Dr. Abel was reluctant to prescribe this because there was no "secure diagnosis."**  *Id.*  Dr. Abel scheduled an ultrasound for September 7, 2001.

Later that same day, Cannon called Dr. Abel's office complaining that there was a confusion with her Lortab because Dr. Abel had only prescribed 22 Lortab and she thought she should get 100 Lortab.  Tr. 353.  Dr. Abel noted she had made a mistake and had **"been tapering her Lortab now down to 100 per month."**  *Id.*

On September 14, 2001, Dr. Abel treated Cannon for conjunctivitis.  Tr.  351.

On September 21, 2001, one of Dr. Abel's staff entered the following note:

> **PT CALLED AND STATES HER EX BOYFRIEND BROKE INTO HER HOUSE LAST SUNDAY AND STOLE HER RX.**  WANTED [DR. ABEL] TO CALL IN REFILL BUT ALBERTSON'S ST FRANCIS FAXED REFILL AUTH[ORITY] STATING SHE LAST REFILLED ON 8-29-01 AND REFILLS ARE EXHAUSTED.  I INFORMED PT **THAT [DR. ABEL] FEELS SHE SHOULD WAIT UNTIL IT IS TIME FOR HER TO REFILL**.  PT BECAME UPSET AND SAID, "IT WAS STUPID SINCE BOYFRIEND BROKE INTO HER HOUSE.  DR. ABEL IS JUST BEING . . . OH JUST NEVER MIND!" AND HUNG UP ON ME.

Tr. 351(emphasis added).

13

On October 5, 2001, Cannon returned for her "monthly follow up for refills." Tr. 350. Cannon reported her **headaches were better** on Topamax, work was better, "**boyfriend stole her pills and she needs some more**." *Id.* Dr. Abel noted, **"I gave her a script for 9/13 for one month."** *Id.* Dr. Abel assessed Cannon as, "Fibromalgia: **continue MS Contin with good response. Feeling better**. getting her life straightened out. advised to talk to her bank about debt consolidation." *Id.*

On **October 8, 2001**, Cannon called Dr. Abel's office requesting a prescription for Ativan and complained of right knee pain. Tr. 349. Cannon informed the individual that she saw Dr. Sodatis and Dr. Bear for this "who rec[ommended] knee repl[acement]." *Id.* Dr. Abel's staff noted "pt was given rx [for Ativan]10/05" and "she will make appt. w/ [Dr. Abel]." *Id.*

On **October 10, 2001**, Albertson's **pharmacist called regarding Cannon taking Ativan and Klonopin at the same time and wanted to know if they should monitor the usage**. Tr. 349. **Dr. Abel agreed that Cannon's usage should be monitored and also wanted the pharmacist to make sure she was not getting it from another doctor**. Dr. Abel requested she be called if that happened.

**On October 31, 2001**, Cannon saw Dr. Abel and complained of a work injury that had occurred about 1 to 1 1/2 weeks before. Tr. 347-349. Cannon reported a patient knocked her down and she hit the concrete with her knees. She complained of right knee pain with swelling. Dr. Abel examined Cannon and noted the left knee was slightly swollen-mild and the right knee was swollen and tender but difficult to examine due to pain. Dr. Abel ordered x-rays and referred Cannon to Dr. Bair. As to the fibromyalgia, Dr. Abel noted, "**doing better on long term**

14

**narcotics but they are not helping the knee pain.**" *Id.* Dr. Bair was to evaluate Cannon the following morning.

On **November 2, 2001**, Cannon called Dr. Abel's office to inform Dr. Abel that she had canceled her October 31st appointment with Dr. Bair and rescheduled it for this day.

## BRANT BAIR, M.D.

On **November 2, 2001**, Brant Bair, M.D., an orthopedic surgeon, evaluated Cannon. Tr. 246. Dr. Bair noted Cannon had a long history of right knee problems (underwent a proximal distal patellofemoral realignment for dislocations at age 15, underwent a debridement arthroscopically of a plica at age 24, underwent an arthroscopic debridement of bone spurs at age 26, and sustained a nondisplaced patella fracture that was treated conservatively at age 32). Cannon was in for evaluation of her October 21, 2001 injury of her right knee. The examination of the right knee revealed a 1+ effusion, range of motion 0-125, the patella had good medial and lateral glide with neutral tilt, the Q-angle was neutral, there was a 1+ patellorfemoral crepitus, and the extensor mechanism was intact. There was medial and posteromedial and lateral joint line pain. The ligaments were stable. Imaging showed no evidence of fracture. Dr. Bair assessed the right knee as a probable right medial meniscus tear. Dr. Bair ordered an MRI scan of the right knee to evaluate the menisci and **prescribed 20 Lortab**.

## LOUISE ABEL, M.D.

On **November 5, 2001**, Cannon called for a refill of her Ativan which Dr. Abel authorized. Tr. 346.

15

On **November 7, 2001**, Cannon called requesting six (6) MS Contin because she could not take her prescription in until November13 otherwise her insurance would not pay for it.  Dr. Abel authorized six (6) MS Contin.

On  **November 8, 2001**, Cannon **called requesting more MS Contin** because she only received 6 pills and she needed enough for three more days.  Tr. 345.  Dr. Abel authorized more MS Contin.

## BRANT BAIR, M.D.

On **November 8, 2001**, Cannon had an MRI of the right knee.  Tr. 245.  The MRI indicated (1) small to moderate effusion; (2) 4mm subchondral defect tibial plateau anteriorly positioned medial to midline; and (3) Grade II intrasubstance degenerative change posterior horn medial meniscus with ill defined peripheral margins posteriorly as well as some truncation of the corners both superiorly and inferiorly and **no tear to an articular surface**.

On **November 13, 2001**, Cannon returned to see Dr. Bair.  Tr. 244.  Cannon reported she was having "tremendous difficulty with the right knee."  *Id*.  Dr. Bair decided to do a right knee diagnostic arthroscopy and debridement partial medial meniscectomy.

On **November 15, 2001**,  Dr. Bair noted that the **MRI was fairly benign but "given the persistent (sic) of the patient's mechanical symptoms we felt an arthroscopy was indicated**." Tr. 242.  Thus, Dr. Bair performed the diagnostic arthroscopy.  Tr. 243.  Dr. Bair directed Cannon to return the following week for a wound check and suture removal.  *Id.*

On **November 21, 2001**, Cannon returned for her follow up with Dr. Bair.  Tr. 240.  Dr. Bair diagnosed Cannon with "status post right knee arthroscopic debridement, chondroplasty

medial femoral condyle 11/15/01." *Id.* Dr. Bair noted that Cannon was still complaining of pain

and **prescribed Percocet** and physical therapy.  Dr. Bair directed Cannon to return in two weeks.

On **December 5, 2001**, Cannon returned for her follow up with Dr. Bair.  Tr. 239.

Cannon reported she was doing well and was progressing with physical therapy but still having

some pain.  Dr. Bair assessed Cannon as "**doing well status post right knee chondroplasty**

**medial femoral condyle**." *Id.*  Dr. Bair noted, "**She will be restricted to sedentary duty only**

**until 01/10/02.  At that time we expect her to return to full duty**." *Id.*

## LOUISE ABEL, M.D.

On **December 5, 2001**, Cannon returned for a follow up visit with Dr. Abel and for a refill

on her MS Contin.  Tr. 344-345.  Cannon also requested Prevacid or Prilosec and a TSH.

**Cannon also stated she was going to Dr. Lakind for her headaches**.  Dr. Abel noted that

Cannon was "unable to work due to knee pain."  Tr. 345.  Dr. Abel noted Cannon needed "labs"

for Dr. Sokoloff.  Dr. Abel gave Cannon a laboratory slip.  Dr. Abel renewed the prescription for

MS Contin.

## BRANT BAIR, M.D.

On **December 26, 2001**, Cannon returned to see Dr. Bair.  Tr. 238.  Cannon complained

that her right knee was doing well until she was involved in a car accident.  Cannon was now

complaining of pain in her left knee.  Dr. Bair noted the left knee had full range of motion, the

patellar mobility was good, and the ligaments were solid.  Cannon was exquisitely tender over the

inferior medial pole of the patellar as well as the medial and lateral joint line.  **The x-rays showed**

**no fractures**.  Dr. Bair assessed Cannon with "left knee pain, severe following motor vehicle

accident." *Id.*  Dr. Bair ordered an MRI scan of the left knee and directed her to return for the

results.  **Dr. Bair also noted Cannon "may return to work but no standing or walking more than 15 min per hour and no lifting**." Tr. 257.

**LOUISE ABEL, M.D.**

On **December 27, 2001**, Cannon returned to see Dr. Abel complaining of depression, rapid weight gain, and knee pain.  Tr. 343-344.  Derek Thompson, M.D., evaluated Cannon.  Cannon stated she had surgery on her knees.  Cannon told Dr. Thompson that she was feeling depressed and thought the Paxil was not working.  **Cannon denied suicidal ideation and reported she was doing well as far as her migraine headaches on the current regimen**.  Dr. Thompson changed Cannon to Zoloft and noted she had a follow up with Dr. Abel in two weeks.

**BRANT BAIR, M.D.**

On **January 3, 2002**, Cannon returned for her follow up with Dr. Bair.  Tr. 234.  Cannon complained that her right knee was worse and her left knee was also painful, swollen, popping, and locking.  Dr. Bair noted conservative measures "with the anti-inflammatories, pain medications and physical therapy had failed."  Cannon requested a repeat arthroscopy of the right knee as well as scope debridement on the left knee.  The examination revealed good range of motion, 1+ to 2+ swelling, exquisite medial and lateral joint line pain, good patellar mobility, and no sign of infection.  **The MRI scan of the left knee showed intact menisci.**  Dr. Bair scheduled the repeat arthroscopic debridement on the right knee and scope debridement on the left knee.

**LOUISE ABEL, M.D.**

On **January 7, 2002**, Cannon returned to see Dr. Abel.  Tr. 341-343.  Cannon complained of feeling depressed and had increased her Zoloft to 100 mg. **Cannon "described herself as being a mess" and "that it is everything personal, business**." *Id.*  Cannon also requested a

18

referral to a dermatologist for a patch on her face and a mole under her left eyelid.  Dr. Abel

noted Cannon reported being "very depressed last month with decreased motivation, tearfulness,

feeling sad."  Tr. 342.  **Dr. Abel noted Cannon looked well and in no acute distress**.  Dr. Abel

increased the Zoloft to 150 mg daily and directed her to return in one week, and to continue with

physical therapy for her knee.

On **January 16, 2002**, Cannon returned for her follow up with Dr. Abel.  Tr. 340-341.

Cannon reported the Ativan was not helping the anxiety and also requested a handicap sticker.

Tr. 340.  **Cannon informed Dr. Abel that she was doing better on 150 mg of Zoloft**.  Tr. 341.

Dr. Abel noted Cannon "**continued on long term narcotics and is doing much better**

**functionally**.  **Thinking about looking for a less stressful job**."  *Id.*

On **January 22, 2002**, Cannon called Dr. Abel's office **seeking a "work excuse**."  Tr.

339.  **Cannon claimed that she had called in sick and "her work threatened her job**."  *Id.*

Cannon also stated she had scheduled an appointment with Dr. Bair because her knees hurt.

Since Dr. Abel was not in the office that day, her staff advised Cannon to get a work excuse from

Dr. Bair.

**BRANT BAIR, M.D.**

On **January 23, 2002**, Cannon returned for her follow up with Dr. Bair.  Tr. 237.  Dr.

Bair noted Cannon was now complaining of her right knee giving her some trouble.  Cannon also

complained about her left knee.  **Dr. Bair noted the "car accident was very minor" and "[t]he**

**car was very drivable."**  *Id*.  **The examination showed  no sign of effusion, intact skin, and**

**solid ligaments**.  There was tenderness of the joint lines on both medial and lateral on both knees.

Dr. Bair ordered an MRI scan of the left knee.

19

**LOUISE ABEL, M.D.**

On **January 25, 2002**, **Cannon went to see Dr. Abel to discuss "possible disability**." Tr. 337-338.  Cannon also requested more MS Contin.  Cannon complained that her knees were "still painful" and "was going to have another MRI of the left knee."  Tr. 338.  Dr. Abel noted she would consult with Dr. Sokoloff to evaluate for systemic illness.  Dr. Abel also prescribed MS Contin, 1 mg, quantity 60.

On **February 4, 2002**, Cannon left a message for Dr. Abel informing her that she was no longer on Amerge for her migraine headaches.  Tr. 335.  **Dr. Lakind had changed her to Axert and now her headaches "aren't as bad**."  *Id.*

On **February 20, 2002**, Cannon returned to see Dr. Abel.  Tr. 334-335.  Cannon informed Dr. Abel that Dr. Bair had done bilateral knee surgery.  **Dr. Abel noted, "looks well, no acute distress.  Long discussion about her <u>disability</u>**."  Tr. 335.  **Cannon reported her headaches had gotten better since she stopped taking Buspar**.

**BRANT BAIR, M.D.**

On **February 26, 2002**, Dr. Bair performed a right knee medial femoral condyle chondroplasty, a right knee limited synovectomy, a left knee medial femoral and patella chondroplasty, and a left knee medial femoral and patella chondroplasty and a left knee limited synovectomy.  Tr. 230.  The pre- and postoperative diagnosis was bilateral knee degenerative joint disease.  *Id.*

**LOUISE ABEL, M.D.**

On **March 13, 2002**, Cannon called Dr. Abel's office requesting Dr. Abel fax a prescription to Alberston's for Phenergan 50 mg "because the Tigan was not working and was stimulating her colon and making her use the bathroom." Tr. 334 (Both Tigan and Phenergan are used for nausea and vomiting but Phenergan is also used for sedation). **Dr. Abel denied the request and asked that she come in**. Cannon called back and was upset because the Phenergan helped her sleep but made an appointment nonetheless. Dr. Abel noted: **"No show. I received a call from Dr. Lakind's office that [Dr. Lakind] was out of town and this pt was requesting refills on Phenergan too early according to their records. I was concerned because we had just given her a script for Tigan a few days earlier**." *Id.*

On **March 18, 2002**, Cannon returned for her follow up with Dr. Abel and to discuss her medications. Tr. 331-333. Cannon reported her knee pain was slightly better since the surgery but could not stand for very long. **Cannon also reported she was "seeking another job." Tr. 332. Dr. Abel encouraged her to think about something sedentary**. At his time, Cannon complained that her **chronic pain was better on MS Contin but requested an increase in her dosage because it "wears off after 6 hours**." *Id.* Under "Assessment," **Dr. Abel noted that Cannon had seen Dr. Sokoloff "who feel she has fibromyalgia but <u>no inflammatory or autoimmune disease at this time</u>**." *Id.* Dr. Abel increased the MC Contin to add 30 mg in the afternoon in addition to the BID dosage and encouraged more gradual exercise.

**BRANT BAIR, M.D.**

On **March 25, 2002**, Cannon returned for a follow up with Dr. Bair. Tr. 228. Dr. Bair examined Cannon's knees and noted the range of motion was about 0 to 114 with good patellar

mobility.  There was no sign of infection and the portals looked well.  The right knee was more swollen than the left.

## LOUISE ABEL, M.D.

On **April 15, 2002**, Cannon returned for a follow up with Dr. Abel.  Tr. 328-329.  Cannon requested a refill of her medications.  **Cannon reported her headaches had improved or lessened on Zoloft, and she was still taking Topamax**. Tr. 329.  Dr. Abel noted her knees were still swollen.  Tr. 329.  Under "Assessment," Dr. Abel noted **Cannon was doing better and was getting job retraining and was optimistic about that**.  Dr. Abel also noted Cannon wanted Percocet instead of mid-day MS Contin.

On **May 1, 2002**, Cannon called Dr. Abel's office requesting more Percocet because she was completely out.  Tr. 327-328.  Dr. Abel approved 30 Percocet.  Tr. 328.

On **May 8, 2002**, Cannon returned for a follow up with Dr. Abel.  Tr. 326-327.  Cannon also requested a referral to an endocrinologist because of weight gain and fatigue.  Cannon reported the physical therapist had informed her that she was not making minimal progress.  **Cannon reported she filed for bankruptcy, had been off work for one month, and continued with job retraining**.  Tr. 327.  Dr. Abel referred her to Dr. Nevill Grant.

## BRANT BAIR, M.D.

On **May 8, 2002**, **Dr. Bair noted Cannon was still having knee pain and would see her again in one month at which time he would release her to light duty**.  Tr. 226.  On this day, Dr. Bair also noted Cannon could still not return to work due to bilateral knee condition but expected her to return to sedentary work by June 17, 2002.  Tr. 252, 253.  Dr. Bair also

prescribed a theraball and opined Cannon needed therapy ball to "enhance recovery from bilateral knee surgery." *Id.*

On **May 11, 2002**, Dr. Bair evaluated Cannon.  Tr. 227.  Dr. Bair's examination of the knees indicated: "**No effusion.  Portals look well.  No sign of infection.  No redness.  No pain with passive range of motion 0 to 90**.  She states the pain is mostly with weight bearing." *Id.*

**LOUISE ABEL, M.D.**

On **May 22, 2002**, **Cannon called Dr. Abel's office to inform Dr. Abel that she had made an appointment to see David Schade, M.D**.  Cannon requested Dr. Abel call Dr. Schade for an earlier appointment since she couldn't see him until September.  Tr. 326.  Dr. Abel questioned why Cannon was seeing Dr. Schade and denied her request because Dr. Abel could only call for an urgent appointment.

On **May 29, 2002**,  Cannon returned to see Dr. Abel for "re-new handicap sticker form, review Dr. Bair's eval[uation], samples of Amerge, pt doing great on natural estrogen, discuss endocrinologist, refill MS Contin and Percocet, pt using Royal Jelly for boosting her energy."  Tr. 323-324.  **Cannon informed Dr. Abel that she was "planning to restart work again through DVR**."  Tr. 324.  Cannon was using an exercise ball at home.  Cannon also claimed she had had a butterfly rash 4 -5imes over past few weeks.  **Dr. Abel noted Cannon thought she had lupus due to the rash but was not interested in seeing Dr. Sokoloff again**.  Dr. Abel recommended Dr. Smith in Los Alamos.  Cannon also requested she see Dr. Schade at UNM and asked Dr. Abel to call him "to move up her appt." *Id.*  Dr. Abel said she would try.

On **June 11, 2002**, Cannon called Dr. Abel's office and asked about her appointment with Dr. Schade.  Tr. 323.  Dr. Abel directed her staff to call Cannon and let her know that "she was

23

not going to call Dr. Schade, to keep her scheduled appointment, doubted if this evaluation would be helpful, and would not press her case ahead of others." *Id.* Cannon told Dr. Abel's staff that **she had not made an appointment** because she was waiting to see if Dr. Abel could get her in sooner.

## BRANT BAIR, M.D.

On **June 12, 2002**, Dr. Bair opined Cannon could return to work on July 1, 2002. Tr. 251, 255.

## LOUISE ABEL, M.D.

On **June 21, 2002**, Cannon called Dr. Abel's office complaining that she had a "really bad month" and **wanted more MS Contin**. Tr. 322. **Dr. Abel denied the request and told her to keep her June 25 appointment and would discuss it with her**.

On **June 25, 2002**, Cannon came into for her scheduled appointment. Tr. 320-321. Cannon stated she had been to the emergency room the previous day for migraines. **Dr. Abel noted Cannon looked well and was in no acute distress**. Cannon complained of "body pain and back pain." Tr. 321. **Dr. Abel assessed Cannon with a generalized flare up of fibromyalgia but was unsure of the cause**. Dr. Abel directed her to use heat, increase Soma to three time a day for a while, and increase the MS Contin to 90 mg in the morning and 60 mg at night.

## BRANT BAIR, M.D.

On **July 3, 2002**, Dr. Bair provided Cannon with a note stating she was "still having problems with knees after surgery and would be off work until July 24, 2002. Tr. 250, 255.

24

## LOUISE ABEL, M.D.

On **July 17, 2002**, Cannon returned for her follow up visit with Dr. Abel.  Tr. 319-320.

Cannon complained of left ankle edema and pain for two weeks, was **wearing an ankle brace**

and "wanted to update Dr. Abel on her knee problem – she now has a lawyer."  Tr. 319.  Dr. Abel

noted:

> Started new anti-inflammatory and developed fluid retention.  Her back is hurting a lot more.
> Knee pain continues daily.  She is icing and using lidocaine patches.  **She went hiking and
> camping with her dogs and sprained her ankle.  She lifted her dogs which are 70 lbs into
> her car.  She had a worsening of her back pain**.
>
> **She is applying for disability for knee and back pain**.  Will refer to Belyn Schwartz for
> **referral.**  Stop Bextra as it is causing edema.  **She plans to see another rheumatologist for
> second opinion on lupus.**

Tr. 320 (emphasis added).

## DONALD HASSERNER, M.D.

On **July 18, 2002**, **Donald Hasserner, M.D.** evaluated Cannon.  Tr. 216-218.  Dr.

Hasserner noted **this was Cannon's first visit and one of the reasons she was there to see him**

**was because of disability**.  Tr. 218.  Dr. Hasserner noted, "I do not see any reason why she

should switch doctors from Dr. Abel, but **she was afraid [Dr. Abel] would not support her**

**disability claim** . . . ."  *Id.*  On this day, Cannon informed Dr. Hasserner she had hypothyroidism,

hypertension, gastroesophageal reflux disease, migraine headaches, a damaged jaw nerve on the

left with multiple surgeries for temporomandibular joint which caused severe pain in her left jaw,

seasonal allergies, that "she had been told that she might have systemic lupus erythematosus," and

"that several physicians have told her that she has fibromyalgia."  Tr. 217.  On this date, Cannon

reported having **two root canals**.  *Id.*  Dr. Hasserner ordered lab work because Cannon reported

she had not had any lab work done "for quite a while."  Tr. 218.  Dr. Hasserner directed Cannon

to return for a follow up in ten days.

**LOUISE ABEL, M.D.**

On **July 22, 2002**,  Cannon called Dr. Abel's office to inform Dr. Abel that she had

scheduled an appointment with Dr. Schwartz' office and requested her records be faxed to Dr.

Schwartz.  Tr. 318.

**BRANT BAIR, M.D.**

On **July 22, 2002**, **Dr. Bair referred Cannon to Dr. Theresa Elliott for "a whole body**

**impairment disability rating and evaluation of her low back pain s/p (status post) bilateral**

**knee scope debridement**."  Tr. 249.

**DONALD HASSERNER, M.D.**

On **July 29, 2002**, Cannon returned for her follow up with **Dr. Hasserner**.  Tr. 214-215.

Dr. Hasserner noted he had not received any medical records for Cannon.  Tr. 214.  Cannon

explained she had not signed a records release form.  Dr. Hasserner noted he recalled asking her

to do so.  **Dr. Hasserner noted Cannon had "seen many, many physicians here in town in**

**Santa Fe,  and in Albuquerque**."  Tr. 214.  Dr. Hasserner also noted the **lab work results were**

**essentially normal, the ANA screen was negative, C-reactive protein was "barely above**

**normal at 1.1," and a rheumatoid factor was less than 20**.  **Dr. Hasserner doubted Cannon**

**had systemic lupus erythematous.**  Tr. 215.  **Dr. Hasserner prescribed 50 Lortab 5 mg, one**

**as needed, with one refill (total 100)**.  Dr. Hasserner directed Cannon to return in one month.

There is no record that Cannon returned to see Dr. Hasserner.  In addition, Cannon did not report

to Dr. Abel or any other physician that she had received Lortab from Dr. Hasserner.

26

**LOUISE ABEL, M.D.**

On **August 1, 2002**, Cannon called Dr. Abel's office to inform the staff of her name change.  Tr. 318.

**BELYN SCHWARTZ, M.D.**

On **August 6, 2002**, Belyn Schwartz, a Fellow of the American Academy of Physical Medicine and Rehabilitation, evaluated Cannon for a **"disability evaluation."**  Tr. 567-570. Cannon reported a history of fibromyalgia since 1988 as diagnosed by "a rheumatologist in Albuquerque," and confirmed by Dr. Amer.  Tr. 567.  Cannon also reported having "**21 root canals**" with "nerve pulp dead in all these teeth."  *Id*.  Cannon complained that "**since the knee surgery she has had increased back pain and pain over the bottoms of her bilateral feet**." *Id*.  On this date, Cannon had "multiple complaints including severe bilateral knee pain and swelling, low back pain, neck pain, and a weight gain of 50 lbs since her work injury."  *Id*.  As far as her functional status, **Cannon reported the following to Dr. Schwartz**:

> **Functional Status**:  The patient states that she is unable to kneel, bend, squat, lift more than 13 pounds.  She has had to put ramps to help lift her dogs into her cars.  She is unable to camp.  After she did so at one point she was in bed for a week.  She states that if she has an active day such as driving to and from Albuquerque and doing a few tasks she then has to spend the next three days recuperating.  She states that she needs to ice her knees two to three times a day and before going to bed, and then she uses ice on her low back and knees all night long.

Tr. 568.  Dr. Schwartz performed a physical examination and found as follows:

> **PHYSICAL EXAMINATION**:  Reveals Ms. [Cannon] to be a good historian.  She has Lidocaine patches attached to her anterior knees.  She moves quite slowly.  She uses a crutch in her left arm, she states cause her right leg is somewhat worse.  Cervical range of motion is somewhat stiff in all planes.  She is only able to bend forward about 10 degrees to 20 degrees with a complaint of low back pain.  She is able to rise up onto her toes and heels somewhat slowly but is unable to take steps stating that it hurts her knees and ankles too much.  Major joints appear to have fairly good range of motion.  Her knees range of motion was approximately to 110 degrees flexion bilaterally.  This testing caused some pain.  She did have some swelling over the left lateral malleolus that was not warm but no significant

27

> obvious swelling over any of her other joints of her hands, wrists, or right ankle.  Muscle
> stretch reflexes were 2+ and symmetric throughout.   Sensation was intact throughout.
> Strength limited by pain but she had at least antigravity strength in all major muscle groups.
> She had fairly exquisite tenderness to palpation at all 18 of the 18 sites as designated by the
> American College of Rheumatology for the diagnosis of fibromyalgia.

Tr. 569.  Based on Cannon's history and this examination, Dr. Schwartz, opined that "[g]iven this patient's multitude of complaints with persistent chronic pain with episodic severe exacerbations I believe this patient would have great difficulty in performing in any type of functional way in a work setting even if the work were sedentary."  *Id.*  Dr. Schwartz further opined:

> I believe Ms. Seay Cannon would require frequent rest breaks.  She would require naps.  She
> would need to move around periodically during the work day in order to mange the pain.  Due
> to the fact that this pain is chronic and episodically more severe I would not expect her to be
> able to day-in and day-out to respond appropriately to supervision, to relate appropriately to
> coworkers or to deal appropriately with customary work pressures.

Tr. 570.  Dr. Schwartz also suggested that, although Cannon may have been evaluated by a rheumatologist in the past, "it was not unheard of for patients to convert from negative to positive in their autoimmune workup" and recommended "another rheumatological opinion regarding the possibility that the basis for some of her pain may be autoimmune in nature."  *Id.*  **Dr. Schwartz referred Cannon back to Dr. Abel since she had "no other significant recommendations for [Cannon's] care"** and opined that Cannon's medical care had "been very well managed by Dr. Abel."  *Id.*

## BRANT BAIR, M.D.

On **August 7, 2002**, **Dr. Bair opined Cannon's knee pain did "not necessarily correlate with the global pain she seems to have in other joints as well.**"  Tr. 224.  Dr. Bair noted Cannon was "in the process of getting further work up and evaluation by both physical medicine and rehabilitation for a disability rating and a functional capacity evaluation" and relinquished

Cannon's care to her primary care physician and appropriate consultants.  *Id.*  **Dr. Bair allowed Cannon to return to work with restrictions.**

On August 8, 2002, Dr. Bair released Cannon to sedentary duty starting August 14, 2002.  Tr. 223, 247.  Dr. Bair included the following restrictions: no bending, no kneeling, no squatting, no lifting greater than 10 pounds, no walking more than 15 minutes every four hours, and no stair climbing. Tr. 247.  Dr. Bair also ordered ice packs to both knees lying down and a foot stool while sitting.

## LOUISE ABEL, M.D.

On **August 12, 2002**, Cannon returned for her follow up with Dr. Abel.  Tr. 316-318. **Cannon also wanted to discuss her disability**.  Tr. 316.  Cannon reported her grandfather was very ill so she was very stressed.  Cannon had seen Dr. Schwartz and had been referred to Leroy Pacheco, a rheumatologist in Albuquerque.  Tr. 317.  **Dr. Abel noted that Cannon's chronic pain was under better control with MS Contin**.

## THERESA GENOVESE-ELLIOT, M.D.

On **August 12, 2002**, Theresa Genovese-Elliott, M.D., a "Board Certified Physical Medicine and Rehabilitation Fellowship Orthopedic, Spine & Sports Medicine" specialist (Tr. 282), evaluated Cannon at Dr. Bair's request.  Tr. 286-289.  Dr. Elliott reviewed Dr. Bair's medical records, noting that Dr. Schwartz was referring Cannon to Dr. Leroy Pacheco in Albuquerque for diffuse arthralgias.  Additionally, Dr. Elliot noted Dr. Bair had released Cannon to return to work in sedentary duty and noted the restrictions.  Dr. Elliott sent Dr. Bair a report setting forth her findings.  Tr. 282-285.  Dr. Elliott's report indicated in part:

> Today, the patient states that she has continued swelling in her knees with constant pain, regardless of weight bearing or sitting and ices the knees daily.  She complains of give away

bilaterally with weakness and a popping sound in the left knee with occasional locking on the left.  She reports that she was given a 7% impairment rating by Dr. Bair.  She was also given Lidoderm patches on her knees which seemed to help some.

In terms of medications, she is taking MS Contin, 30 mg, 5 times a day, 2 in the morning, 1 at noon and 2 at night.  She is also taking Percocet, 10 mg at 12:00 PM and 4:00 PM for breakthrough pain.  These are prescribed by her primary care physician, **Louise Abel**.  She also has a **presumptive diagnosis of fibromyalgia and will be seeing Dr. Leroy Pacheco for this.**

She also states that she is having low back pain that developed around March or April of this year.  It is not related to any specific injury and developed after her initial fall.  She has been using crutches since her fall to ambulate.  She states that the low back pain is central, non-radiating and there is not numbness or tingling noted in her legs.  She rates it as 8-9 on a scale of 10 and constant.  She states that she cannot lie on her stomach due to the discomfort.  She tolerates sitting for approximately 2 hours.  She also states that her symptoms increase in the morning and are better with movement and while sitting erect.  She has tried multiple non-steroidals in the past and has not tolerated most of these, as she has a history of gastritis.  She did not complete her pain diagram.  She states that she tolerates sitting for 1 to 2 hours, standing and walking for 15 minutes at a time.  She also states that she is no longer able to go camping, walk her dogs, or hike or ski.

**        \*\* \*\* \*\* \*\* \*\* \*\***

**REVIEW OF SYSTEMS**:  She describes generalized weakness, anxiety, weight gain, depression, fatigue, insomnia, headaches, unexplained fevers and chills, gastric reflux and swollen joints.

**PHYSICAL EXAMINATION**:
GENERAL:  This is a **healthy appearing** and pleasant woman who is **not in any acute distress**.  No pain behaviors are noted.  She is wearing Lidoderm patches over her patella region bilaterally.  She is ambulating using a crutch under her left arm.
KNEE EXAM:  No effusion is noted, no discoloration.  Active left knee range of motion reveals flexion to 60 degrees, extension to -10, right knee flexion to 65 degrees, extension to -10.  _____ on the left measures 10 degrees and on the right 14 degrees.  She has **mild pain** in the medial compartment with range of motion.  Bilateral crepitus is appreciated.  Patellar grind test is positive bilaterally.
NEUROLOGICAL EXAM:  There is normal tone and bulk in the lower extremities bilaterally.  Strength is 5/5 and symmetric throughout.  Deep tendon reflexes 2+ and symmetric at the patella and Achilles.  Sensation is intact to sharp object throughout.  Straight leg raise is negative in a sitting and supine position.
PALPATION:  She has tenderness and muscle spasms in the bilateral thoracic and lumbar paraspinal muscles.  No central pain to PA pressure appreciated.  No gluteal tenderness noted.

**IMPRESSION:**

30

1.      Bilateral knee pain related to a fall at work on 10-21-01, with subsequent bilateral arthroscopic chondroplasties.  This is in the setting of bilateral previous patellar tendon transfers many years ago in which the patient states that after this was surgically corrected, she had very minimal symptoms.  The patient states that since her recent injury, she not been able to ambulate without the use of a crutch and her activities are significantly limited.  There is a note in the medical records, however, that the patient was feeling fairly good until she had another fall at work, as well as car accident.  I will need to clarify this with the patient at her next follow up appointment to help determine causation.  Apparently, the patient has been released by Dr. Bair, was given an impairment rating of 7% and returned to work in a sedentary capacity.  I agree with Dr. Bair that it appears that the patient has reached MMI in terms of her knee pain.

2.      **Low back pain, myofascial in nature**.  The patient's neurologic examination is unremarkable.  Additionally, the pain developed in March, several months after her original injury and is not felt to be directly related tot he injury of 10-21-01.  In fact, it is my suspicion that this is myofascial in nature, **related to her prolonged crutch use**.

**RECOMMENDATIONS:**
1.      I am recommending that she return to physical therapy for 2 additional sessions to insure that her home exercise program is appropriate.
2.      For the back, I have sent her to therapy for evaluation for a cane so that she may discontinue use of the crutch, back stretches and a stabilization program for 2 sessions.
3.      I have given her samples of Zanaflex, 2 mg at night for painful muscle spasms.
4.      In terms of her narcotic medications, I will not prescribe these, as her primary physician, Louise Abel, is currently doing this.
5.      Fibromyalgia, she will be seen by Leroy Pacheco, rheumatologist in Albuquerque for this.  This is not felt to be work related.
6.      No prescriptions for non-steroidals, as the patient reportedly does not tolerate these.
7.      The patient will follow up after she has completed therapy.  At that time, I suspect the patient will be at MMI and an impairment rating will be given.

**MMI:**  As above, anticipate after completing therapy.

**RETURN TO WORK:**  Sedentary, working up to 6 hours a day, no bending, squatting and climbing, limit standing and walking to 15 minutes at a time, sitting to 2 hours at a time with icing every 3 hours.  **Will suggest a functional capacity evaluation after she has completed therapy**.

Tr. 283-285 (emphasis added).

On **August 19, 2002**, Cannon returned to see Dr. Elliott.  Tr. 278.  Dr. Elliott noted that after she initially saw Cannon, "[Cannon] called my office several times requesting to be placed

31

off work one time and then to be referred to Dr. White in Albuquerque for a second opinion regarding knee replacements." *Id.* Because Cannon had "so many concerns," Dr. Elliott offered to see her that day [August 19]. Cannon informed Dr. Elliott that she had gone ahead and scheduled an appointment with Dr. White and would be seeing him on August 21, 2002. **Cannon also informed Dr. Elliott that she had not started therapy because the adjuster had not returned her calls and had not returned to work because her work had not returned her calls.** Dr. Elliott reiterated that Cannon did not need a total knee replacement and was not precipitated by the work injury. Cannon informed Dr. Elliott that she would pursue the need for a knee replacement through her private insurance. Cannon requested a prescription for a cane which Dr. Elliott provided. **Dr. Elliott also released her back to sedentary work, 6 hours in a day with no other changes. Dr. Elliott directed Cannon to return for re-evaluation on August 26, 2002. Dr. Elliott noted "Once the FCE is done, she will be placed at MMI and given an impairment rating."** *Id.*

## ST. VINCENT HOSPITAL

On **September 4, 2002**, Cannon went to the emergency room at St. Vincent Hospital. Tr. 554-560. Cannon complained of a migraine headache. Tr. 554. Cannon complained her headache was aggravated by that mornings physical therapy. Under, "Medications," Cannon reported she was taking estrogen, Levothroid, Lisinopril, Reglan, Soma, Topmax, Amerge, and Melatonin. *Id.* **Notably, Cannon failed to report that she was also taking MS Contin, Percocet, Ativan, and Klonopin.** The physician ordered Demerol 125 mg and Phenergan 50 mg, intramuscularly. Tr. 556.

**<u>LINDA REID, P.T.</u>**

On **September 6, 2002**, Linda Reid, P.T., performed a Functional Skills Assessment at Dr. Elliott's request.  Tr. 263.  Ms. Reid performed an extensive evaluation.  Tr. 263-274.  Ms. Reid found in pertinent part:

> Conclusion:  **Overall assessment <u>is not</u> an accurate representation of <u>her</u> functional capacities**.  **This determination is made through correlation of consistency of efforts, final outcomes, changes in pulse rates upon exertion, ratings of perceived exertion, pain reports, pain behaviors, and general movement patterns**.
>
> The validity components of grip strength testing were <u>valid</u>.  The client scored 2 positive out of 5 on Waddell's Non-Organic Signs, indicating <u>her</u> perception of physical condition is consistent with physical presentation.  **Range of motion measurements were <u>invalid</u> and <u>should not</u> be used to determine impairment rating.  Lifting, carrying, and pushing test results were all <u>questionable.</u>**

Tr. 263 (emphasis added).  Ms. Reid also opined as follows:

> This individual demonstrated the ability to perform safely within the **light physical demand level as defined by the <u>Dictionary of Occupational Titles</u>.  This <u>is</u> what the client was mentally and physically able to do this date.**
>
> **<u>BEHAVIORAL PROFILE:</u>  The client scored 100% positive for inappropriate illness behavior for the diagnosis of back and knee pain**.  She reported high RPE's and pain levels throughout the FCE.  Her functional movements and knee pain reports were 75% consistent, however, her back pain levels and functional movement were not.  **She appears to be pain focused, and self-limited her shoulder lift and probably her carries**.  She stated in the beginning of the test that she would need to take pain meds when this was over.  At 12:30 she asked if she could take pain medication.  She took something on an empty stomach which she later called morphine.  She stated "they take a while to work, and at 1:00 she said she felt nauseous."  The test was over.  She sat for BP & pulse.  **She left at 1;15 in no more observable distress than she had come in with**.  At 2:45 she phoned to report she had gone home and vomited.
>
> **<u>VOCATIONAL CONSIDERATIONS:</u>  This client is able to work in the light physical demand level, lifting and carrying 20 lbs**.  Presently the less she uses her knees, in material handling the better until she rehabilitates them to be mobile joints (**of which they have the potential, per medical records**).  She can sit frequently, stand occasionally and walk occasionally intermittently.  Meaning she requires sitting breaks between walks at this time.  She cannot kneel, crawl or ladder climb.  She can squat, bend and stair climb occasionally.  She can reach frequently.

Tr. 266 (emphasis added).

## LOUISE ABEL, M.D.

On **September 9, 2002**, Yvonne, and employee in Dr. Elliott's office, called Dr. Cannon's office. Tr. 315. Yvonne reported that Cannon had called in tears because her insurance had been canceled and she could not pay for them and **would being going into "withdrawals."** *Id.* Dr. Abel noted the following:

> brief discussion [with Dr. Elliott] about drugs, **she was asking for drugs**. [Dr. Elliott] will refer Sahmantha Cannon back to me for MS Contin. **[Dr. Elliott] says that the amount of pain [Cannon] has does not correlate with her x-ray or arthroscopic finding to date**. **It is unclear why Sahmantha is short on MS Contin as she should have enough until 9/12**.

Tr. 316 (emphasis added).

On the same day, **September 9, 2002**, Cannon called Dr. Abel's office asking for a refill on her MS Contin and her Percocet claiming she would go into withdrawals if she did not get them that day. Tr. 315. Dr. Abel prescribed MS Contin, quantity 150 with no refills and Percocet, quantity 60 with no refills.

## THERESA GENOVESE-ELLIOTT, M.D.

On **September 16, 2002**, Cannon returned for a follow up with Dr. Elliott. Tr. 276-277. Dr. Elliott noted that since "[Cannon] was last seen, she has called my office multiple times for many separate issues." Tr. 276. Dr. Elliott noted:

> **SUBJECTIVE:** During one phone call, she **wanted a referral to see Dr. White which I did not approve**. Another time she **called to ask me if I would refill her narcotic prescriptions for her**, as she had been fired from her job and was losing her health insurance. I did speak with her primary physician, Dr. Abel, and we agreed that only she should refill the patient's narcotic medications. **Subsequently, I got a call from the patient that she was firing Dr. Abel**, however today she states that she has an appointment to follow up with her on Wednesday. She also has an appointment with another physician to try to establish another primary care doctor. **On her own, she did see Dr. White who told her than (sic) she was not a candidate for a knee replacement**. I did also speak with Dr. Bair who has discharged her from his care and did give her an impairment rating of 7%. She has been placed at MMI

34

by Dr. Bair.  Lately, she has been under a lot of stress, as her grandfather has been ill.  **She also was seen by Dr. Jacqueline Dean in Albuquerque and I spoke with <u>Dr. Dean who stated that she did not believe that the patient had an underlying autoimmune or arthritic condition that was causing her continued pain and symptoms.</u>  She did complete therapy and was given a home exercise program for her knee, as well as for her back and she is feeling better**.  I, again, reminded her that I do not feel that her back symptoms are related to her original injury.

**PHYSICAL EXAM:**

General:  The patient is **in no acute distress**.  She is pleasant and cooperative.  **There is no effusion noted over her knees.  No warmth or tenderness noted.  Range of motion is full and pain free.  Varus and valgus stressing is unremarkable.  There is some mild discomfort with patella compression bilaterally.**

**IMPRESSION:**
1.      Status-post fall on 10-21-01 with subsequent bilateral arthroscopic chondroplasty. Arthroscopy revealed intact menisci bilaterally, as well as intact patellas.
2.      Back pain, not felt to be work related.
3.      Chronic depression, not directly related to her work injury of 10-21-01.
4.      Chronic pain syndrome and fibromyalgia.

**PLAN:**
1.      Her prescriptions were refilled.  She remains on MS Contin, 60 mg in the morning and 90 mg a night and Percocet, 2 tablets in a day prescribed by her primary care physician.  She is also taking 90 Ativan in a month.
2.      I have recommended pool therapy for the patient, 2 times a weeks for 4 weeks for a general condition and independent exercise program.

**MMI:**  Apparently, the patient was placed at MMI by Dr. Bair, according to the patient. However, I do not have medical records documenting this.  It is my medical opinion, therefore, that the patient has reached maximum medical improvement today, 09-16-02.

**IMPAIRMENT RATING:**  I consulted the AMA Guides to the Evaluation of Permanent Impairment, 5th Edition, Chapter 17.  The patient does not qualify for an impairment based on arthritic conditions.  It is my medical opinion that given the history of direct trauma due to a fall on her knees with complaint of patellofemoral pain and crepitation on physical exam without joint space narrowing on x-ray, this patient qualified for a 2% whole person impairment related to each knee for a **total 4% impairment rating.**

**RETURN TO WORK:**  The patient underwent an FCE on 09-06-02.  **This was not felt to be an accurate representation of her functional capacity due to inconsistencies in effort, etc.**  The range of motion measurements were considered invalid and were not felt to be reliable to be used in determining an impairment rating.  Her lifting, carrying and pushing tests were all felt to be questionable.  The patient scored 100% positive for inappropriate illness behavior for the diagnosis of back and knee pain.  The results of the FCE suggest the patient is **able to work in a light duty capacity, lifting up to 20 lbs. maximum.  Standing and walking should be limited to 15 to 30 minutes at a time.  Bending, squatting and climbing stairs should be limited to occasional and she should not squat nor climb ladders.  She is able to work an 8 hour day.**

Tr. 276-277.

**LOUISE ABEL, M.D.**

On **September 18, 2002**, Cannon returned for her follow up with Dr. Abel.  Tr. 313.

Cannon reported her insurance "was cut off" and that Dr. Elliott had evaluated her for disability.

Tr. 314.  **Dr. Abel noted Cannon "had a functional capacity exam which qualified her for**

**light duty**."  *Id.*  Cannon complained that she was "very stressed" and "feels depressed."  *Id.*  Dr.

Abel noted Cannon's general appearance, "looks well, no acute distress, well groomed."  *Id.*  **Dr.**

**Abel directed Cannon to be as active as possible**.

On **September 29, 2002**, Cannon went to the emergency room at St. Vincent Hospital.

Tr. 548-552.  Cannon complained of a migraine headache with nausea and vomiting, and an

infected molar.  Tr. 548.  Under "Medications," Cannon reported she was taking Amerge,

Topomax, Reglan, estrogen, thyroid meds, Lisinopril, Soma, and Keflex.  *Id.*  **Notably, Cannon**

**failed to mention that she was also taking MS Contin, Percocet, and Ativan.  The physician**

**ordered Demerol 125 mg and Phenergan 50 mg, intramuscularly**.  Tr. 549.

On **October 8, 2002**, Cannon went to the emergency room at St. Vincent Hospital.  Tr.

541-546.  Cannon complained of a migraine headache.  Tr. 541.  Under "Medications," Cannon

reported she was taking estrogen, Lisinopril, Reglan, Levothroid, Topamax, Prozac, and Amerge.

*Id.*  Notably, Cannon failed to mention that she was also taking MS Contin, Percocet, and Ativan.

The physician ordered Dilaudid 3 mg and Phenergan 50 mg, intramuscularly.  Tr. 542.  Cannon

received a second dose of Dilaudid 2mg, intramuscularly.  *Id.*

On **October 9, 2002**, Cannon returned to see Dr. Abel for a referral for her knee and back

for worker's compensation.  Tr. 311-313.  Dr. Abel noted, "This 39 yr old female presents for

comprehensive medical examination.  Right knee catching and a snap when she walks.  She had

seen Dr. Bair and he does not wish to follow.  She asks about Auge in Española.  Her knee swells

every day."  Tr. 311.  Dr. Abel noted Cannon's **fibromyalgia was "currently stabilized on**

**Lortab 180 per month**."  Cannon informed Dr. Abel that she was seeing Dr. Belyn Schwartz in

November for back pain and disability evaluation.  Dr. Abel also noted **"no new symptoms of**

**depression or anxiety."**

On **October 16, 2002**, Cannon returned to see Dr. Abel.  Tr. 308-311.  Cannon informed

Dr. Abel that she had been in the emergency room two days before with a severe right

flank/abdominal pain.  Tr. 308.  Cannon claimed that she had been told in the emergency room

that her gallbladder was inflamed and needed a biliary HIDA scan.  Dr. Abel noted Cannon was

"**on antidepressants with fair response**."  Tr. 310.  Dr. Abel admitted Cannon and sought a

surgical consultation.  On **October 17, 2002**, **the HIDA scan results were negative, the upper**

**quadrant ultrasound was normal, the UGI was negative**.  Tr. 438.

On **October 28, 2002**, Cannon returned for her follow up following her hospitalization.

Tr. 307-308.  Cannon complained that she was still having right upper quadrant pain with

radiation to the back and nausea and diarrhea.  Tr. 307.  **Dr. Cannon noted the work-up in the**

**hospital was "unrevealing including UGI series, ultrasound, HIDA scan (gallbladder scan),**

**surgical consultation."**  *Id*.  Dr. Abel referred Cannon for x-rays and laboratory work which

were normal.

On **October 31, 2002**, Cannon called Dr. Abel's office complaining that Toradol was

making her "swell like the Bextra."  Tr. 690.  Dr. Abel directed her to discontinue the Toradol.

On **November 6, 2002**, Cannon returned for a follow-up with Dr. Abel.  Tr. 688-689.

Cannon complained of abdominal pain after eating a "fatty" type meals.  Tr. 688.  Dr. Abel noted,

"**Pt is convinced that she has gallstones."**  Tr. 689.  Dr. Abel referred Cannon to Dr. Voltura

for re-evaluation of abdominal pain.

On **November 18, 2002**, Cannon called Dr. Abel's office to report "an episode worse than

she has ever had one before."  Tr. 685.  Cannon requested Dr. Abel call her as soon as possible.

Dr. Abel returned the call but "was unable to reach" Cannon.  *Id.*

On **November 19, 2002,** Cannon called Dr. Abel's office requesting "more pain meds."

Tr. 684.  Cannon reported she was on MS Contin and wanted more Percocet.

On **November 20, 2002,** Cannon called Dr. Abel's office requesting prescription refills.

Tr. 683-684.  Cannon requested Phenergan 25 mg instead of 50 mg because her insurance would

not pay for them.

On **November 25, 2002,** Cannon called Dr. Abel's office regarding her Ativan

prescription.  Tr. 682-683.  Cannon was questioning why **Dr. Abel had not authorized a refill**

**for her Ativan** and did not "want to go into **withdrawals** since she has been out of [Ativan] for a

week."  Tr. 682.  Dr. Abel noted: **"I am concerned about how much she is using and do not**

**wish for her to get addicted to them as they are very habit forming."**  Tr. 683

On **December 4, 2002**, Cannon returned for a follow up with Dr. Abel.  Tr. 680-682.

Cannon gave as her chief complaint: "refill Ms Contin & Percocet."  Tr. 680.  Dr. Abel authorized

a prescription refill for both the MS Contin 30 mg, quantity 150, and the Percocet, quantity 60.

Tr. 680-681. Cannon informed Dr. Abel that she was having an MRI for **severe thoracic back**

pain and would be seeing Dr. Auge for her knee pain.  **Dr. Abel noted, looks well, no acute distress**.

On **December 16, 2002,** Cannon called Dr. Abel's office requesting a prescription refill for Percocet because her pain "came back again," and she wanted her medications for the holidays.  Tr. 678.  **Dr. Abel's staff noted Cannon had just received sixty (60) Percocet on December 4th**.  Dr. Abel approved the request for more Percocet.

On **December 19, 2002,** Cannon called Dr. Abel's office requesting a lower dosage Percocet because her insurance would not pay for the higher dosage.  Tr. 678.  Dr. Abel approved the change in dosage.

On **December 23, 2002**, Cannon called Dr. Abel's office requesting Ativan 1 mg, quantity 90, because she wanted to take it three times a day and commented that "she really needs it today because her life is totally turned around, her insurance went up and her work-comp got lowered so she needs it ASAP."  Tr. 678.  Dr. Abel's office staff noted Cannon's last refill was on November 25, 2002, quantity 60.  Dr. Abel approved the refill.

**ST. VINCENT HOSPITAL**

On **January 2, 2003**, Cannon went to the emergency room at St. Vincent Hospital.  Tr. 533-536.  Cannon complained of a migraine headache for the past three days with nausea and vomiting.  Tr. 533.  Under "Medications," Cannon reported that she was taking estrogen, Reglan, Soma, Levothroid, Prozac, vitamins, bee jelly, Ativan, and Amerge.  *Id.*  **Notably, Cannon failed to report that she was also taking MS Contin and Percocet**.  *Id.*  The physician ordered Demerol 125 mg and Phenergan 50 mg intramuscularly.  Tr. 534.  The physician also prescribed

39

Phenergan 25 mg suppositories, quantity 5 and noted "oral narcotics to be prescribed by Dr. Abel's office only and directed Cannon to call Dr. Abel's office.  Tr. 533.

On **January 4, 2003**, Cannon had an MRI of her thoracic spine done at St. Vincent Hospital.  Tr. 451.  The report indicated there was "**a very small annular bulge at the T6-7 level without evidence of significant spinal stenosis or neural foraminal narrowing**." *Id.*

## LOUISE ABEL, M.D.

On **January 6, 2003**, Cannon returned to Dr. Abel's office "requesting to review her MRI results" and "requesting refills on her medications."  Cannon also complained of severe constipation.  Tr. 676-677.  On that day, Cannon reported to Dr. Abel that her "**back pain [was] episodic**."  Tr. 676.  Dr. Abel advised Cannon that the MRI showed a "**very small bulging disc at T6-7**." *Id*.  **On examination, Dr. Abel noted Cannon's general appearance as "looks well, no acute distress," "tender over T6 area <u>subjectively</u>**."  Tr. 677.  Dr. Abel referred Cannon to NM Sports and PT (physical therapy) and counseled her regarding the need to keep her stool soft. Dr. Abel prescribed Peri-colace for the constipation.

On **January 20, 2003**, Cannon called Dr. Abel's office requesting a refill of her Percocet. Tr. 675.  Dr. Abel authorized a refill of 60 Percocet.

## ST. VINCENT HOSPITAL

On **February 1, 2003**, Cannon went to the emergency room at St. Vincent Hospital.  Tr. 527-531.  Cannon complained that she had a migraine headache after having a root canal.  Tr. 527.  Cannon also reported having a "<u>bulging disc</u>" and fibromyalgia. *Id.*  Under "Medications," Cannon reported she was taking Reglan, estrogen, Levothroid, Soma, Amerge, Prozac, and a supplemental vitamin. *Id.* **<u>Notably, Cannon failed to report that she was also taking MS</u>**

**Contin, Percocet, and Ativan.**  The emergency room physician ordered Demerol 125 mg and Phenergan 50 mg intramuscularly.  Tr. 528.

## LOUISE ABEL, M.D.

On **February 3, 2003**, Cannon returned for a follow up visit with Dr. Abel.  Tr. 672-674. Cannon reported she had seen Dr. Shapiro for hemorrhoids.  Cannon also requested a refill of her medications.  According to Cannon, she "had her 25th root canal last week."  Tr. 673.  **Dr. Abel performed a physical examination and noted Cannon looked well and was not in acute distress**.  Dr. Abel also noted the fibromyalgia was the same and the knee arthritis was still bad but stable.  Dr. Abel prescribed MS Contin 30 mg, quantity 150, no refills.  Tr. 674.

On **February 24, 2003,** Cannon called Dr. Abel's office requesting a refill on her Percocet.  Tr. 672.  Dr. Abel authorized the refill.

On **March 3, 2003,** Cannon returned for a follow up with Dr. Abel.  Tr. 671.  Cannon complained of knee pain.  Tr. 671.  Dr. Cannon examined Cannon, noting: "looks well, no acute distress, swelling right knee and some on left knee, slight crepitus and limited ROM, no bruising." *Id*.  Dr. Abel assessed Cannon as having arthritis of her knee and ordered x-rays.  Dr. Abel also noted Cannon had seen Dr. White who recommended arthroscopy.

## ST. VINCENT HOSPITAL

On **March 10, 2003**, Cannon went to the emergency room at St. Vincent Hospital.  Tr. 521-525.  Cannon complained of having a migraine headache for twenty-four hours.  Tr. 521. Under "Medications," Cannon reported she was taking estrogen, Levothroid, Reglan, Prozac, Soma, and Amerge.  *Id.*  **Notably, Cannon failed to report that she was taking MS Contin,**

41

**Percocet, and Ativan**.  The physician ordered Demerol 125 mg, Vistaril 50 mg, and Phenergan 50 mg intramuscularly.

**LOUISE ABEL, M.D.**

On **April 2, 2003**, Cannon returned for her follow up visit with Dr. Abel.  Tr. 669-670. Cannon requested a letter authorizing an exercise machine and a refill of her MS Contin and Percocet.  Cannon requested she be switched to OxyContin (Percocet) since it worked well in the past.  Dr. Abel prescribed OxyContin and discontinued the MS Contin.  **Dr. Abel also ordered laboratory work, noting it was normal in October**.

On **April 14, 2002,** Cannon called Dr. Abel's office requesting a refill of the Percocet.  Tr. 669.  Dr. Abel authorized the refill for 60 Percocet and no refills.

On **April 28, 2003**, Cannon returned for a follow up with Dr. Abel.  Tr. 667-668.  Cannon requested Robaxin, injectable Phenergan instead of suppositories, and refills of her medications. Tr. 667.  Cannon reported she was very stressed because her dog died.  **Dr. Abel noted Cannon looked well and was in no acute distress**.  Dr. Abel prescribed Baclofen because Cannon reported the Robaxin was not helping her back pain.  Dr. Abel also prescribed OxyContin 20 mg, quantity 150, no refills.

On **April 30, 2003**, Cannon called Dr. Abel's office requesting a prescription refill.  Tr. 666-667.  Cannon again requested injectable Phenergan instead of the suppositories.  Dr. Abel noted she preferred Cannon used Phenergan syrup.  Tr. 667.

On **May 5, 2003**, Cannon called Dr. Abel's office complaining that the Baclofen made her "swell." Tr. 666. Dr. Cannon directed Cannon to discontinue the Baclofen.

## ST. VINCENT HOSPITAL

On **May 6, 2003**, Cannon went to the emergency room at St. Vincent Hospital. Tr. 515-519. **Cannon complained that she was "under enormous amount of stress" and had a migraine headache for the <u>past three days</u> even though she did not mention having a migraine headache to Dr. Abel on the previous day**. Tr. 515. Under "Medications," Cannon reported she was taking Amerge, estrogen, Reglan, Soma, Prozad, and Levothroid. *Id.* **Notably, <u>Cannon failed to report that she also was taking MS Contin, Percocet, and Ativan on a regular basis</u>. The physician prescribed Dilaudid 0.5 mg, Phenergan 25 mg, and Benadryl 50 mg intramuscularly and also gave Cannon a <u>prescription for Vicodin</u> (same as Lortab), quantity 10**. Tr. 516.

## LOUISE ABEL, M.D.

On **May 20, 2003**, Cannon called Dr. Abel's office requesting Amerge for her migraine headaches. Tr. 662. Dr. Abel authorized Amerge and Percocet refill, quantity 60.

On **May 28, 2003**, Cannon returned for her follow up visit with Dr. Abel. Tr. 660-661. Cannon complained that she "**was not going out as much** since she had to put her dog to sleep." Tr. 661. Cannon also requested Dr. Abel switch her back to the MS Contin for her pain. Cannon informed Dr. Abel that she was going to Dr. Lakind in July. Dr. Abel noted, "**Planning some fun events next week**." Tr. 662.

On **June 2, 2003,** Cannon called Dr. Abel's office requesting "anything that will take away her headache except Imitrex." Tr. 660. Cannon reported her pain started in the neck and jaw. Dr. Abel prescribed Tomax.

On **June 11, 2003**, Cannon called Dr. Abel's requesting Percocet. Tr. 659. Dr. Abel prescribed Percocet, quantity 60.

On **June 25, 2003**, Cannon returned for a follow up visit with Dr. Abel. Tr. 657-659. Cannon complained of back pain and thought it was related to her weight gain. Cannon complained that her lower back bothered her when she stood to do the dishes. According to Cannon the pain was present at night and radiated to her left buttock. Cannon requested Dr. Abel fill out "her disability evaluation." Tr. 658. **Dr. Abel noted the cause for the back pain was "unclear why but suspect weight gain and inactivity**." Tr. 659. **Dr. Abel recommended Cannon increase her pain medication and exercise. Dr. Abel noted Cannon <u>had not started her exercise program yet,</u> "but did receive her machine and will put it together**." Tr. 658. **Dr. Abel opined Cannon's "chronic pain" was tolerable on MS Contin**. Tr. 659. Dr. Abel prescribed MS Contin 30 mg, quantity 150, Ativan 1 mg, quantity 40.

## ST. VINCENT HOSPITAL

On **July 10, 2003**, Cannon went to St. Vincent Hospital. Tr. 506-513. Cannon complained of migraine headache, right flank pain with radiation to right groin and stated the pain was similar to "kidney stone pain." Tr. 506. Under "Medications," Cannon reported she was taking estrogen, Levothroid, Reglan, Soma, Prozac, and Amerge. *Id*. **Notably, Cannon did not report that she was taking MS Contin or Percocet. In fact, Cannon requested Percocet which the emergency room physician prescribed.** Tr. 509. **The emergency physician order**

44

laboratory work, which was normal, and a CT scan of the abdomen and the pelvis, which was also normal.  Tr. 509.  **The physician also noted there were <u>no stones</u>**.  *Id.*  The physician diagnosed Cannon with back pain, and migraine headache and noted she had an appointment with her primary care physician in four days.  *Id.*   The physician prescribed morphine sulfate 2-4 mg and Phenergan 25 mg IV.  Tr. 507.  Cannon received Phenergan 25 mg IV at 1225 hours, morphine sulfate 4 mg IV at 1220 hours, morphine sulfate 2 mg IV at 1315 hours, morphine sulfate 4 mg IV at 1350 hours, and morphine sulfate 4 mg IM at 1400 hours.  *Id.*

## <u>LOUISE ABEL, M.D.</u>

On **July 14, 2003**, Cannon called Dr. Abel's office requesting a refill of her Percocet.  Tr. 656.  Dr. Abel prescribed 60 Percocet.  **<u>There is no record that Cannon reported receiving Percocet in the emergency room on July 10, 2003</u>**.

## <u>ST. VINCENT HOSPITAL</u>

On **July 22, 2003,** Cannon went to St. Vincent Hospital.  Tr. 500-504.  Cannon complained of a migraine headache, vomiting, and nausea.  Tr. 500.  Under "Medications," Cannon reported taking estrogen, Levothroid, Soma, Prozac, Reglan, and Amerge.  *Id.*  **<u>Again, Cannon did not report that she was taking MS Contin and Percocet</u>**.  Cannon also reported she possibly had lupus.  Tr. 502.  Cannon was given Demerol 25 mg, Vistaril 50 mg, and Phenergan 25 mg, intramuscularly.  Tr. 501.

## <u>LOUISE ABEL, M.D.</u>

On **July 23, 2003**, Cannon returned for a "follow up visit, a prescriptions refill, and for her migraines."  Tr. 652.  Cannon complained to Dr. Abel that she had more pain than normal due to jaw pain with her root canals.  **Cannon presented a new theory to Dr. Abel regarding her**

**illnesses**.  According to Cannon, she thought she was exposed to chemicals three years prior when she worked for Dr. Milroy.  **Cannon complained that she was having more "all over body pain," her knee pain was worse, and she could not stand for more than 10 minutes**.  Tr. 653.  **Dr. Abel noted the exam showed no change and that Cannon was "feeling very stressed about finances**."  Tr. 654.

On **August 11, 2003**, Cannon called Dr. Abel's office requesting a Percocet refill and needed to pick up her medication today because she was leaving town at 6:30 a.m. the following day.  Tr. 651.

## ST. VINCENT HOSPITAL

On **August 19, 2003**, Cannon went to the emergency room at St. Vincent Hospital.  Tr. 492-497.  Cannon complained of a migraine headache that started on August 18.  Tr. 492.  Under "Medications," Cannon reported taking Amerge, Soma, Effexor, estrogen, Levathroid, and Phenergan.  *Id.*  **Notably, Cannon did not report that she was taking MS Contin, Percocet, or Ativan**.  The physician prescribed Demerol 125 mg and Vistaril 50 mg intramuscularly.  Tr. 493.

## LOUISE ABEL, M.D.

On **August 20, 2003**, Cannon returned for a follow up with Dr. Abel.  Tr. 650.  Cannon's chief complaint was that she needed her medications refilled.  Cannon reported she was not taking Ativan anymore.  Cannon also complained that her pain was still very bad and was having a root canal on Monday but was kept awake with tooth pain.  *Id.*  Cannon reported she had vomited the day before due to a migraine.  **Dr. Abel noted she suspected back strain from the weight gain and that the Effexor was helping the fibromyalgia**.  **Dr. Abel prescribed exercise but**

46

**Cannon reported her exercise machine was broken**.  Dr. Abel also prescribed MS Contin 30

mg, quantity 150.

On **September 5, 2003**, Cannon called Dr. Abel's office requesting a prescription refill.

Tr. 648.  Dr. Abel authorized Percocet, quantity 60.

On **September 10, 2003,** Dr. Abel renewed Cannon's Ativan prescription and authorized

30 for insomnia.

On **September 17, 2003**, Cannon returned for a follow up visit with Dr. Abel.  Tr. 646-

645.  Cannon reported she could not stand for more than 5 minutes.  Dr. Abel noted Cannon

looked well, was in no acute distress, and she had tenderness over her left hip laterally.  **Dr. Abel**

**ordered x-rays of the left hip and noted Cannon "still has not put together her exercise**

**machine**."  **Dr. Abel also noted all the laboratory work was normal** and prescribed MS Contin

30 mg, quantity 150.

On **September 22, 2003,** Cannon called Dr. Abel's office requesting a prescription for

Diflucan.  Tr. 646.  Dr. Abel authorized the prescription.

On **October 2, 2003,** Cannon called Dr. Abel's office requesting a refill of the Ativan.  Tr.

645.  Cannon explained that she was taking two Ativan at night to help her sleep.  Dr. Abel

approved the refill.

**ST. VINCENT HOSPITAL**

On **October 2, 2003**, Cannon went to the emergency room at St. Vincent Hospital.  Tr.

482-491.  Cannon complained of a left foot injury.  The physician assessed Cannon with "soft

tissue injury left foot."  Tr. 485.  The physician directed Cannon to use ice, elevate, and use

crutches.  Tr. 482.  Notably, under "Medications," Cannon listed that she was taking Reglan,

Soma, Amerge, Levothroid, Prozac, and estrogen.  *Id.*  **Cannon failed to report that she also was taking narcotics, MS Contin and Percocet.  Accordingly, the physician prescribed Lortab, quantity 20.**  Cannon also failed to mention that she was taking Ativan.

48

**LOUISE ABEL, M.D.**

On **October 21, 2003,** Cannon called Dr. Abel's office informing her staff that she had a sinus infection and needed Keflex or Frova.  Tr. 645.  Cannon received Frova samples since Keflex was not indicated.  Cannon also received a prescription for Ceftin 500 mg.

**NM Vocational Rehabilitation**

On **October 22, 2003**, Cannon reported to her counselor at New Mexico Division of Vocational Rehabilitation that her disabilities were "s/p (status post) 7 knee surgeries and now has DJD, **bulging disc in back**, fibromyalgia, Hashimoto's disease with hypothyroidism, and depression."  Tr. 159.   In fact, Cannon's January 4, 2003 MRI of the thoracic spine indicated she had "**minimal** annular bulge at T6-7 without evidence of significant spinal stenosis or neural foraminal narrowing."  Tr. 451, 537.  Dr. Abel had explained these results to Cannon.

**LOUISE ABEL, M.D.**

On **October 23, 2003**, Cannon again called Dr. Abel's office requesting Keflex.   Tr. 644.  Cannon was informed that Keflex was "usually not strong enough for sinus infection."  *Id.*

On **October 28, 2003**, Cannon called Dr. Abel's office requesting a refill of her Percocet.  Dr. Abel prescribed Percocet, quantity 60.

On **November 11, 2003**, Cannon returned to see Dr. Abel with complaints of depression because she was off her medication for two weeks due to "insurance problems."  Tr. 642.  Cannon was also complaining of a toothache.  Dr. Abel referred Cannon to Dr. Heckel for a revaluation of her knee.  Cannon requested a referral to Dr. Schwartz.

49

**BELYN SCHWARTZ, M.D.**

On **November 19, 2003**, Cannon returned to see Dr. Schwartz.  Tr. 565-566.  **Dr. Schwartz noted that she had not seen Cannon since August 6, 2002, when she evaluated her "from the perspective of disability**."  Tr. 565.  Cannon reported that she had not been able to work since she last saw Dr. Schwartz.  Cannon complained of pain in her back, neck, and knees, and severe migraine headaches two to three times a week.  Cannon also reported that since her last visit "she did have an MRI of her thoracic spine and was found to have a T6-7 disc bulge." *Id.*  **Cannon reported she was housebound, leaving her home only two times a week, "mostly for doctor's appointments**."  *Id.*  **According to Cannon, her parents did her shopping and, when she did her own shopping, friends had to help her with lifting heavier items such as dog food into her car.  Cannon also reported she had been unable to clean her house for many months.**

Dr. Schwartz performed a physical examination and noted that Cannon moved "quite slowly" and used a single-point cane in the right hand.  Cervical range of motion was stiffly performed in all planes, forward flexion was 20 degrees with pain, bilateral knee full extension was lacking and flexion was approximately 120 degrees bilaterally.  There was no swelling of the joints of the hands, wrists, or ankles.  Reflexes were 2+ and symmetric throughout.  Sensation was intact throughout but strength was limited by pain.  Cannon exhibited "exquisite tenderness to palpation at all 18 of the 18 sites as designated by the American College of Rheumatology for the diagnosis of fibromyalgia."  *Id.*

Dr. Schwartz reiterated her August 6, 2001 opinion that Cannon was unable to "engage in gainful employment" for the same reasons she previously noted in support of that opinion.  Tr. 566.  Dr. Schwartz referred Cannon back to Dr. Abel for pain management.

On **November 24, 2003**, Dr. Schwartz completed an "Estimated Functional Abilities Form."  Tr. 563-564.  Dr. Schwartz opined Cannon could lift 1-10 pounds occasionally, and never lift anything heavier.  Dr. Schwartz  found Cannon could never bend, kneel, crawl, or climb stairs, but could occasionally reach above her shoulders and push/pull 10 pounds.  Dr. Schwartz also found Cannon could only tolerate 2 hours of sedentary activity.  Finally, Dr. Schwartz opined that Cannon was permanently disabled.  Tr. 564.  Dr. Schwartz noted she based her findings on Cannon's report and her clinical experience and not on measured capacity.

## LOUISE ABEL, M.D.

On **December 9, 2003,** Cannon returned for a follow up with Dr. Abel.  Tr. 635.  Cannon complained of abdominal pain.  Tr. 635.  There is a note indicating Dr. Abel called Cannon to advise her that the ultrasound was negative again but would refer her to Dr. Shapiro for any further ideas.

## NM Vocational Rehabilitation

On **December 12, 2003**, Cannon reported to her counselor at New Mexico Division of Vocational Rehabilitation that **she could not meet with her until January because she had been taking care of her father following his surgery**.  Tr. 154.

## LOUISE ABEL, M.D.

On **December 31, 2003**, Cannon returned to see Dr. Abel with complaints of chest pain and shortness of breath.  Tr. 639.  Dr. Abel prescribed antibiotics.

51

On **January 20, 2004**, Cannon called Dr. Abel's office requesting prescription refills.  Tr. 639.  Dr. Abel prescribed Percocet, quantity 60.

On **January 22, 2004**, Cannon called Dr. Abel's office requesting samples of her migraine medication.  Tr. 638.  Dr. Abel authorized the request.

On **January 27, 2004,** Cannon came in for her follow up with Dr. Abel.  Tr. 636-638.  Cannon reported she "**was doing well**" and needed a papsmear.  Tr. 637.  **Dr. Abel noted some of Cannon's medications had been scaled down and her blood pressure was normal**.  Cannon informed Dr. Abel that she would be seeing Dr. Heckel for her knees.  **Dr. Abel performed a physical examination and noted Cannon "looks well, no acute distress.**"  *Id.*  Dr. Abel refilled Cannon's medications.  **Dr. Abel had scaled down the quantity of MS Contin to 90.**  Tr. 638.

**ST. VINCENT HOSPITAL**

On **January 31, 2004**, Cannon went to the emergency room at St. Vincent Hospital.  Tr. 598-601.  Cannon complained of a migraine headache "for a couple of days."  Tr. 598.  Under "Medications," Cannon reported she was taking estrogen, Levothroid, Reglan, Soma, Acifex, Prozac, Lasix, Frovan, and Ativan.  *Id.*  **Notably, Cannon failed to report that she was also taking MS Contin and Percocet.**  The physician ordered Demerol 125 mg and Phenergan 50 mg, intramuscularly.  Tr. 599.

**LOUISE ABEL, M.D.**

On **February 6, 2004**, **Cannon called Dr. Abel's office claiming she had "lost the hard copy of the Percocet [prescription] the last time she came in.**"  Tr. 636.  Cannon requested another prescription be faxed to her pharmacy.  **Dr. Abel refused this request and**

52

**noted Cannon could refill [prescription] in one month**.  Dr. Abel's office staff noted Cannon "was very upset and does not understand why this cannot be refilled."  *Id.*

On **February 12, 2004,** Cannon returned to see Dr. Abel.  Tr. 633.  Cannon reported she had been to the emergency room two weeks before for migraines.  Cannon complained of shortness of breath.  Dr. Abel noted Cannon looked well and was in no acute distress.  The examination indicated Cannon's lungs were clear.  Dr. Abel assessed Cannon with asthma and prescribed an inhaler.

On **February 24, 2004**, Cannon went to Dr. Abel's office to pick up some samples for her migraines and for medication refills.  Tr. 631-632.

On **March 10, 2004**, Cannon called Dr. Abel's office requesting a refill of her Percocet.  Tr. 629.  Dr. Abel authorized Percocet, quantity 60, with no refills.

On **March 18, 2004**, Cannon returned to see Dr. Abel.  Tr. 627-628.  Cannon complained of "lack of energy x1 month."  Tr. 627.  Cannon also complained that she was having hot flashes.  Dr. Abel assessed Cannon with fatigue and ordered lab work to check her thyroid.  Dr. Abel also increased the Prozac to 30 mg every other day, alternating with 20 mg.

## ST. VINCENT HOSPITAL

On **March 23, 2004**, Cannon went to the emergency room at St. Vincent Hospital.  Tr. 594-597.  Cannon complained of a migraine headache.  Tr. 594.  Under "Medications," Cannon reported she was taking Frova, estrogen, Levothroid, Prozac, Soma, Advair, Phenergan, and vitamins.  *Id.*  **Notably, Cannon failed to report that she also was taking MS Contin, Percocet, and Ativan**. The physician ordered Phenergan 25 mg, Vistaril 50 mg, and Dilaudid 2

mg, intramuscularly.  Tr. 595.  Cannon received a second dose of Dilaudid 2mg, intramuscularly.

*Id.*

## LOUISE ABEL, M.D.

On **March 23, 2004**, Cannon called Dr. Abel's office complaining of mouth sores.  Tr. 627.  Cannon requested Zovirax.  Cannon was directed to see Dr. Rhymes or go to urgent care.  Cannon reported she had been to the emergency room at St. Vincent Hospital earlier that day for a migraine headache and would just wait.

On **March 31, 2004**, Cannon called Dr. Abel's office requesting a refill of her Percocet.  Tr. 626.  **Dr. Abel refused to refill the Percocet because it was too soon**.

On **April 8, 2004**, Cannon called Dr. Abel's office requesting her Percocet refill.  Tr. 625.  **Dr. Abel's staff noted Cannon was not due for a refill until April 10, 2004**.

On **April 20, 2004**, Cannon returned to see Dr. Abel complaining of tooth pain.  Tr. 623-624.  Cannon also requested prescription refills.  **Dr. Abel assessed Cannon as "chronic pain– tolerating MS Contin well– knows to keep on it and not stop suddenly**."  Tr. 624.

On **May 6, 2004**, Cannon returned to see Dr. Abel.  Tr. 624-625.  Cannon's chief complaint was "tooth pain."  Tr. 625.  Dr. Abel noted Cannon was working on her knee problems and stopped the Advair.  Dr. Abel also noted Cannon's breathing was fine.

On **May 18, 2004,** Cannon returned to see Dr. Abel.  Tr. 622-623.  Cannon complained of allergies and requested refills of her Percocet and Ativan, MS Contin and estrogen.  Tr. 622.  Cannon also requested samples for her migraines.

54

**ST. VINCENT HOSPIAL**

On **May 21, 2004**, Cannon went to the emergency room at St. Vincent Hospital. Tr. 590-593. Cannon complained of a migraine headache. Tr. 590. Under "Medications," Cannon reported she was taking Prozac, Reglan, Soma, esterase, Levothroid, and Frova. *Id.* **Notably, Cannon failed to report that she was also taking MS Contin, Percocet, and Ativan**. The physician ordered Dilaudid 3 mg, Phenergan 25 mg, and Vistaril 50 mg, intramuscularly. Tr. 591.

**LOUISE ABEL, M.D.**

On **June 3, 2004**, Cannon returned for a follow up visit with Dr. Abel and for her prescription refills. Tr. 620. **Cannon reported she had gotten a job part-time doing office work for home visiting nurses in Los Alamos**. Tr. 621. Accordingly, the legal nurse consulting job training was going to stop. Dr. Abel noted she gave Cannon samples of Frova and Relpax and renewed all her medications for chronic pain to cover her while the office was on vacation.

**BELYN SCHWARTZ, M.D.**

On **June 18, 2004**, Cannon's attorney sent Dr. Schwartz a Physician's Questionnaire and requested Dr. Schwartz complete it. Tr. 577-581. Dr. Schwartz reiterated her findings of the August 2002 and the November 19, 2003 visits, ultimately opining Cannon was "permanently impaired & unable to work." Tr. 578.

**LOUISE ABEL, M.D.**

On **June 30, 2004**, Cannon called Dr. Abel's office requesting prescription refills. Tr. 619. Dr. Abel prescribed Percocet, quantity 60.

On **July 13, 2004,** Cannon returned to see Dr. Abel. Tr. 617-618. Cannon complained of right lower kidney, flank, and lower quadrant pain for one week. Tr. 617. **Cannon reported a**

**"gradual onset of severe right flank pain after starting work**." Tr. 618. The examination showed Cannon was tender over the right CVA. Dr. Abel noted that Cannon "would like to avoid ER." Tr. 619. Dr. Abel instructed Cannon to drink four liters of fluid per day and strain her urine.

On **July 15, 2004**, Cannon called Dr. Abel's office complaining that she was not better. Tr. 617. Dr. Abel ordered and IVP to check for kidney stones.

## ST. VINCENT HOSPITAL

On **July 20, 2004**, Cannon went to the emergency room at St. Vincent Hospital in an ambulance. Tr. 586-589. **Cannon complained of right flank pain with radiation to right lower quadrant abdomen.** Tr. 586. On this date, Cannon reported that she was taking estrogen, Levothroid, Prozac, Soma (as needed), Albuterol inhaler (as needed), Percocet (as needed), and Ativan (as needed). *Id.* The physician ordered a "CT scan of the abd– renal stone protocol," a chest x-ray, and laboratory work (CBC, Chem 15, and HCG-B). Tr. 587. **The CT scan and chest x-ray were negative**. Tr. 589. **The physician diagnosed Cannon with "right upper quadrant, flank pain, nonspecific with no nausea or vomiting**." Tr. 586. The physician ordered Dilaudid 2 mg, intramuscularly at 7:05 p.m. Tr. 587. At 7:40 p.m, Cannon received a second dose of Dilaudid 4 mg, and Zofran (indicated for the treatment of nausea), intramuscularly. *Id.* At 9:25 p.m., Cannon received a third dose of Dilaudid 3 mg, intramuscularly. *Id.* **The physician also prescribed Percocet, quantity 6**. Tr. 586. The physician referred Cannon back to Dr. Abel.

## LOUISE ABEL

On **July 27, 2004,** Cannon called Dr. Abel's office requesting a refill of her Percocet.  Tr. 615.  Dr. Abel prescribed Percocet, quantity 60, no refills.

On **August 5, 2004**, Cannon returned to see Dr. Abel.  Tr. 52.  Cannon complained of right flank pain and pain in her left jaw.  Dr. Abel assessed Cannon with (1) ? neuralgia: suspect trigeminal neuralgia– defer treatment until after steroid course; (2) flank pain:? lupus: ANA have been negative– **full work up negative**, try steroid course.

On **August 10, 2004**, Cannon called Dr. Abel's office requesting her prescriptions.  Cannon wanted MS Contin and Tigan suppositories.  Tr. 52.  Dr. Abel prescribed MS Contin 60 mg, quantity 90.

On **August 26, 2004**, Cannon called Dr. Abel's office requesting Percocet.  Tr. 51.  Dr. Abel prescribed Percocet, quantity 60.

On **August 30, 2004**, Cannon returned for a follow up visit with Dr. Abel.  Tr. 49.  Cannon complained of "left sided jaw pain" and requested Neurontin.  **Dr. Abel noted, "looks well, no acute distress, sore in mouth on tongue."**  Tr. 50.  Dr. Abel assessed Cannon with herpes labialis and prescribed Zovirax and Neurontin 300 mg (used in the treatment of postherpetic neuralgia), one three times a day, quantity 30.

On **September 23, 2004**, Cannon returned to see Dr. Abel with complaints of "left sided jaw pain."  Tr. 48.  Cannon complained that the Neurontin did not help and reported that she had not left her house in two weeks because she was so miserable.  Cannon also reported that she had had this pain for nine years.  Tr. 49.  **Dr. Abel noted, "General appearance: looks well, no acute distress," "face with hypersensitivity."**  *Id.*  Dr. Abel assessed Cannon with "facial pain"

57

and referred her to the Pain Center.  Dr. Abel also prescribed MS Contin 60 mg, quantity 90 and Ativan 1 mg, quantity 75.

On **October 12, 2004**, Dr. Abel noted, "**her MRI is reading as normal.  I would recommend she follow up with the pain clinic.**"  Tr. 47.  **One of Dr. Abel's employees was unsuccessful in contacting Cannon and noted: "Left detailed message on machine, I think pt is out of town."**  *Id.*

On **October 21, 2004**, Cannon returned for a follow up with Dr. Abel.  Tr. 45.  Cannon complained that she was having more knee pain.  Tr. 45-47.  **According to Cannon, she "went on a brief walk and got painful knees."**  *Id.*  Cannon also complained that "her face pain was worse over sinuses."  Tr. 46.  **Significantly, Cannon reported she was "still taking MS Contin but at a lower dose.**"  *Id.*  **Dr. Abel noted that Cannon looked well and was in no acute distress.**  Dr. Abel ordered a CT scan of her sinuses and noted Cannon was planning to see Dr. Frank for her jaw pain.  Dr. Abel prescribed MS Contin 60 mg, **quantity 90** and Ativan 1 mg, quantity 75.  Tr. 47.

On **November 5, 2004**, Cannon returned for a follow up with Dr. Abel.  Tr. 44-45.  **Dr. Abel informed Cannon that her sinus CT scan was negative.**  Tr. 45.  Cannon complained that her jaw pain continued and was planning on seeing Dr. Frank.  *Id.*  Cannon also requested a laboratory slip for hormone levels that a physician in Florida that she found on the internet had requested.  Tr. 44.  Dr. Abel provided the laboratory slip and prescribed Ativan 1 mg, quantity 75. Tr. 45.

On **November 18, 2004**, Cannon returned to Dr. Abel's office for her prescription refills. Tr. 42.  Cannon reported "she had steroid injections with Dr. Frank."  *Id.*  Dr. Abel noted Cannon

58

had a "nerve bundle injection at SVH (St. Vincent Hospital) Pain Clinic 3 days ago– has a lot of jaw pain bilaterally and wonders about teeth grinding."  Tr. 43.  Dr. Abel recommended she see a therapist.  Dr. Abel diagnosed Cannon with "jaw pain: wonder about teeth grinding: try Cymbalta."  *Id.*  Dr. Cannon also prescribed MS Contin 60 mg, quantity 90, and Ativan 1 mg, quantity 75.

On **November 23, 2004**, Cannon called Dr. Abel's office requesting more Replax (indicated in the treatment of migraine headaches) samples.  Tr. 42.  Dr. Abel gave Cannon six samples.

On **December 1, 2004**, Cannon called Dr. Abel's office requesting more Ativan.  Tr. 41. Cannon claimed she was taking the Ativan along with the Soma for her jaw pain.  **Dr. Abel directed her employee to call Cannon and inform her that it was too soon to refill the Ativan**.  Cannon responded that she would come in to see Dr. Abel if necessary to get more Ativan because "she was not able to eat or sleep due to the pain."  *Id.*  **Dr. Abel did not give Cannon more Ativan but suggested she use a bite guard or jaw guard every night**.  Dr. Abel noted Cannon's recent lab results, low DHEA levels, low pregnenolone and progesterone levels. Dr. Abel prescribed Estrace 1 mg, one tablet every day, quantity 45.  Cannon called back to inform Dr. Abel that she was no longer on Estrace because she longer had insurance benefits but was not feeling well and vomited all night.

On **December 8, 2004**, Cannon called Dr. Abel's office requesting more Ativan.  Tr. 40-41.  Cannon reported "she was taking her Ativan too much and she [was] now out [and] can she have just 10 and she will be in on the 14th."  Tr. 40.  Cannon claimed she was taking the Ativan

for her jaw pain.  Tr. 41.  **Dr. Abel denied the request because it was too soon to refill the Ativan.**

On **December 14, 2004**, Cannon returned for her follow up with Dr. Abel.  Tr. 39-40.  Cannon complained of "having jaw pain and sinus pain across the forehead, teeth, both sides of her lower jaw and back of her head"headache and claimed she scratched her right eye lid the previous night.  Tr. 39.  Cannon reported she was seeing Dr. Brown on Friday.  **Cannon described the pain "like it is on fire and lasts about 12 hours**."  *Id.*  Cannon told Dr. Abel that ice packs helped the pain.  **Dr. Abel noted Cannon looked well and was in no acute distress.**  Tr. 40.  Dr. Cannon noted "**slight** injection both conjunctiva" but **no abrasion** and diagnosed Cannon with conjunctivitis (**pink eye**).  Dr. Cannon prescribed Erythromycin ointment for the conjunctivitis (pink eye), Oxycontin 20 mg, quantity 90, and Ativan 1 mg, quantity 75.  **Dr. Cannon recommended a neurological evaluation for the headaches since the CT scan was negative.**

On **December 15, 2004**, Cannon called Dr. Abel's office complaining that the **Erythromycin ointment was "blinding her for 3 hours after putting it on" and "making her claustrophobic."**  Tr. 38.  Cannon requested a prescription for Tobramyacin drops "since she had it in her house, tried it, and it worked."  Dr. Abel approved of Cannon's request.

On **December 20, 2004**, Cannon called Dr. Abel's office requesting samples for her migraine headaches.  Tr. 38.  **Cannon reported she was taking one pill of Imitrex a day to help control her migraine headaches.**  Cannon reported she had and an appointment with Dr. Walsky, a neurologist, for her headaches in early January.

**BELYN SCWARTZ, M.D.**

On **April 21, 2005,** Cannon returned to see Dr. Schwartz but was seen by a physician assistant (PA).  Tr. 752-755.  **"The main reason for [Cannon's] visit today is that she needs a letter regarding her inability to work for Social Security**."  Tr. 752.  The PA reiterated Dr. Schwartz' opinion that Cannon "remains unable to work with continuing decline in functional status."  *Id*.  The PA based this conclusion on reports from Cannon that she had been bedridden due to shingles, had diffuse body pain with worse pain at the knees, neck, and mid back, and now had "recently had difficulty with her bilateral hand strength and coordination."  *Id*.  **Significantly, Cannon insisted "she was pretty sure she has lupus."**  *Id*.  According to Cannon, she planned on seeing Dr. Ralph Williams, a rheumatologist to get a second opinion.

The PA dictated a letter for Social Security Disability and had Dr. Schwartz sign it.  Tr. 753, 755.  The letter indicated Cannon had been followed by Dr. Schwartz since August 6, 2002 for multiple conditions and she "would have great difficulty in performing in any type of functional way in a work setting, even if the work were sedentary."  Tr. 754

On **June 22, 2005**, Cannon returned to see Dr. Schwartz.  Tr. 751.  Cannon informed Dr. Schwartz that she was appealing her Social Security denial.  Cannon reported "she has been diagnosed with lupus, but does not know her titer level."  *Id.*  **Cannon also complained of "searing right upper quadrant pain" and presented to be in acute distress, "guarding and holding her abdomen."**  *Id.*  Dr. Schwartz performed a physical examination and found good bowel sounds, a soft "belly" and point tenderness in the right upper quadrant.  **Dr. Schwartz referred Cannon to the emergency room for the "searing right upper quadrant pain,"**

61

referred her to Dr. Abel for pain management, referred her to Dr. Smith for lupus-related issues

and instructed her to return "as needed for Social Security disability-related issues." *Id.*